# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ARMOR ALL/STP PRODUCTS COMPANY,<br>　　　Plaintiff,<br><br>v.<br><br>TSI PRODUCTS, INC., MICHAEL QUEST, and WILLIAM QUEST,<br>　　　Defendants. | No. 3:17-cv-1131 (MPS) |

## **RULING ON MOTION TO COMPEL ARBITRATION**

Plaintiff, Armor All/STP Products Company ("Plaintiff"), brings this action against Defendants TSI Products, Inc., Michael Quest, and William Quest (collectively, "Defendants") for allegedly deliberately copying Plaintiff's trademarks, trade dress, and creative works in order to compete with Plaintiff in the market for "do-it-yourself" refrigerant kits for vehicle air conditioners. Plaintiff brings claims for trademark infringement, trademark counterfeiting, unfair competition, trade dress infringement, and false advertising under the Lanham Act, 15 U.S.C. § 1051 *et seq*., and copyright infringement under the Copyright Act, 17 U.S.C. § 501 *et seq*. Plaintiff also brings claims for trademark infringement, unfair competition, and unjust enrichment under Connecticut common law, and for unfair competition under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a, *et seq.* Finally, Plaintiff brings a claim for false patent marking under 35 U.S.C. § 292. (*See* Amended Complaint, ECF No. 9.)

Defendants move to dismiss the complaint for lack of subject matter jurisdiction and to compel arbitration under the Federal Arbitration Act and a provision of a consulting agreement

they argue governs this dispute. (ECF No. 22.)[1] For the reasons set forth below, the motion is DENIED.

## I.     Factual Allegations

The following facts are taken from the amended complaint (ECF No. 9) and the exhibits attached to the parties' briefs.

### A.  Plaintiff's Brand and Products

Plaintiff is "the recognized leader" in the industry of "do-it-yourself" kits for replenishing lost chemical refrigerant in vehicle air conditioners, a process called "recharging." (ECF No. 9 ¶ 12.) Plaintiff's products allow consumers to add refrigerant to their own vehicles, avoiding the need to take the car to be serviced by a professional mechanic. (*Id*.) Plaintiff sells its products at major hardware and automotive supply retail stores throughout the United States. (*Id*. ¶ 15.) Plaintiff also maintains three websites that provide consumers with instructions for using its kits and other information about its products. (*Id*. ¶ 17.)

Plaintiff's brands of do-it-yourself refrigerant kits and refill products are sold under several trademarks, including "HIGH MILEAGE," "A/C PRO," "ARCTIC FREEZE," "SUB-ZERO," "EZ CHILL," and "BIG CHILL." (*Id*. ¶ 14.) The United States Patent and Trademark Office ("PTO") has issued Plaintiff two federal trademark registrations for the "HIGH MILEAGE" mark, one for the word mark HIGH MILEAGE for use in connection with "refrigerant chemical preparations for use in connection with automobile air conditioners," and one for a stylized mark displaying the word HIGH in diagonal, upward sloping letters above the word MILEAGE, which is also displayed in diagonal, upward sloping letters in "an odometer style format." (*Id*. ¶ 18.) The

---

[1] In the alternative, Defendants have also moved to dismiss for lack of personal jurisdiction (ECF No. 24) and to transfer venue to the Northern District of Texas (ECF No. 26). I address those motions in separate rulings.

HIGH MILEAGE marks were registered in 2011 and 2012, respectively, but Plaintiff and its predecessor IDQ have sold refrigerant products under the marks since at least as early as 2004, using online, print, and in-store advertising. (*Id*. ¶ 20.) The HIGH MILEAGE marks were originally registered to IDQ but were acquired by Plaintiff during its merger with IDQ in 2015. (*Id*. ¶ 23.)

Plaintiff also uses certain trade dress on its "A/C PRO" and "HIGH MILEAGE" families of products. (*Id*. ¶ 24.) Plaintiff's A/C PRO trade dress includes a black canister with a large black and white A/C PRO logo along the top of the front face of the canister with a black and white image of a man positioned behind the logo, a blue banner along the middle of the canister, and a set of icons and short phrases along the bottom of the canister summarizing the benefits of the product. (*Id*. ¶ 25.) Certain versions of Plaintiff's A/C PRO products also include a banner with an image of a clock across the top of the canister. (*Id*. ¶ 26.) Others display the HIGH MILEAGE word mark across the front face of the canister. (*Id*.) Plaintiff also uses a HIGH MILEAGE trade dress for certain products, which prominently displays the stylized HIGH MILEAGE mark in red and white on the front face of the canister. (*Id*. ¶ 27.)

Plaintiff has sold do-it-yourself refrigerant products featuring its BIG CHILL and ARCTIC FREEZE marks since 2005. (*Id*. ¶ 28.) Plaintiff's BIG CHILL product line features a "prominent mountain design mark and trade dress," displaying a snow-covered mountain behind the BIG CHILL logo on the face of the product. (*Id*.) Plaintiff's ARCTIC FREEZE products have featured a blue trade dress since 2005. (*Id*. ¶ 29.) In 2014, Plaintiff commissioned the design of new ARCTIC FREEZE product labels and advertising materials featuring images of snow-covered mountains. (*Id*. ¶ 30.) Plaintiff began distributing ARCTIC FREEZE products with the redesigned label featuring the snow-covered mountain design mark in 2016. (*Id*. ¶ 32.)

In 2017, Plaintiff filed applications with the U.S. Copyright Office to register as creative works the labels featured on its A/C PRO and HIGH MILEAGE-branded products. (*Id.* ¶ 35.)

**B. The Parties' Relationship and the Consulting Agreement**

In 2007, refrigerant product supplier E.F. Products, L.P. ("EF"), merged with Interdynamics, Inc. ("Interdynamics") to form IDQ, Plaintiff's corporate predecessor. (*Id.* ¶ 38.) At that time, Defendant William Quest was employed as President of EF and Defendant Michael Quest served as Vice President, Secretary, and Treasurer of EF. (*Id.* ¶ 40.) EF used the HIGH MILEAGE marks before it merged with Interdynamics. (*Id.* ¶ 39.) After the merger, the marks were transferred to IDQ, and then to Plaintiff after Plaintiff's merger with IDQ. (*Id.*) Following the merger, Michael Quest remained employed by IDQ as Executive Vice President from 2007 to 2009, and then provided IDQ with consulting services in connection with the sales of refrigerant products from 2009 to 2011. (*Id.* ¶ 42.)

Paragraph 42 of the amended complaint alleges that Michael Quest's work as a consultant for IDQ was governed by a consulting agreement ("the Consulting Agreement") executed on July 28, 2009. The Consulting Agreement provided that Michael Quest would not compete with IDQ until January 1, 2014. (*Id.* ¶ 42.) It also contained confidentiality provisions requiring him to keep confidential certain information learned during his employment with IDQ. (*Id.*) The confidentiality provision was to remain in effect indefinitely after the termination of the Consulting Agreement. (*Id.*)

The complaint does not attach or, except in paragraph 42, refer to the Consulting Agreement, but Defendants have attached a copy to their motion to dismiss and compel arbitration. Article VII, Section 7.1 of the Consulting Agreement provides:

> Section 7.1 <u>Remedy</u>. Should Consultant engage in or perform, either directly or indirectly, any of the acts prohibited by Article IV or, in any other way, violate such

Article, it is agreed that the Company shall be entitled to full injunctive relief, to be issued by any competent court of equity, enjoining and restraining Consultant and each and every other person, firm, organization, association, or corporation concerned therein, from the continuance of such violative acts. The foregoing remedy shall not be deemed to limit or prevent the exercise by the Company of any or all further rights and remedies which may be available to the Company hereunder or at law or in equity.

Article IV of the Consulting Agreement sets forth the non-compete and confidentiality obligations referred to in paragraph 42 of the complaint, as well as other obligations. Article VII, Section 7.2 of the Agreement sets forth the arbitration clause on which Defendants' motion relies:

Section 7.2 Arbitration. Subject to Section 7.1 of this Agreement, the only mechanism to settle any dispute, controversy or claim arising out of or relating to this Agreement shall be settled [sic] by binding arbitration in Garland, Texas, before a single arbitrator in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator may be entered in the federal courts located in Texas.

(ECF No. 23-2 at 7.) Article VII, Section 7.11 provides that it "is binding on [Michael Quest] and [IDQ] and their successors and assigns." (*Id.* at 9.)

### C. Defendants' Brand and Products

In 2014, William and Michael Quest allegedly co-founded the "Avalanche" division of Defendant TSI Products, Inc., which also produces automotive refrigerant products. (ECF No. 9 ¶ 38.) Plaintiff alleges that in January 2015, TSI launched the family of "Avalanche" refrigerant products featuring a blue and white trade dress with a label design and snow-covered mountain design mark similar to those used by Plaintiff. (*Id.* ¶ 43.) Plaintiff alleges that TSI employed former employees of Plaintiff who "may . . . have had access to information and designs related to Plaintiff's 2014 ARCTIC FREEZE redesign project during their employment by Plaintiff." (*Id.* ¶ 44.) Since 2015, Avalanche products have competed directly with Plaintiff's BIG CHILL and ARCTIC FREEZE products. (*Id.* ¶ 43.)

Defendants launched a new line of premium refrigerant products, the Avalanche Black Diamond products, in April 2016. These products allegedly compete directly with Plaintiff's A/C PRO line of premium products. (*Id.* ¶ 47.) Plaintiff alleges that one of these products uses a "counterfeit imitation of Plaintiff's HIGH MILEAGE Marks," and replaced the blue and white color scheme used on Defendant's mid-tier refrigerant products with a dark grey or black label resembling Plaintiff's A/C Pro and High Mileage trade dress. (*Id.* ¶¶ 47-48.) Plaintiff alleges that these products feature a stylized snow-covered mountain logo resembling Plaintiff's ARCTIC FREEZE mountain mark and compete directly with Plaintiff's ARCTIC FREEZE products. (*Id.* ¶ 48.) The products also feature the words "HIGH MILEAGE" in upward-sloping diagonal lettering and the word "MILEAGE" in an "odometer format." (*Id.* ¶ 50.) Plaintiff alleges that TSI copied its trade dress and trademarks and used them on Avalanche products with the intent to trade on Plaintiff's recognition in the market and goodwill. (*Id.* ¶ 45.)

## II.    Legal Standard

The Federal Arbitration Act ("FAA") provides that "a written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "establishes a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008); *see also Doctors Assocs. v. Hamilton*, 150 F.3d 157, 162 (2d Cir. 1998) ("Any analysis of a party's challenge to the enforcement of an arbitration agreement must begin by recognizing the FAA's strong policy in favor of rigorously enforcing arbitration agreements."). Under 9 U.S.C. § 4, a court must compel arbitration if it finds that there has been a "'failure, neglect, or refusal' of any party to

honor the agreement to arbitrate." *Phillips v. Cigna Invs.*, 27 F. Supp. 2d 345, 349 (D. Conn. 1998) (quoting 9 U.S.C. § 4). "[A] party cannot be required to submit to arbitration," however, "any dispute which he has not agreed to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001).

When deciding motions to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks and citations omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [a court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted). In this case, the parties do not dispute the facts pertinent to arbitrability, which consist of the allegations of the complaint and the text of the Consulting Agreement.

In the Second Circuit, "courts follow a two-part test to determine the arbitrability of claims. In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).[2] Because no one disputes that Michael Quest entered into a valid

---

[2] Defendants style the motion to compel arbitration as a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Whether the parties agreed to arbitrate the dispute, however, does not affect the Court's subject-matter jurisdiction. Here, Plaintiff's federal statutory claims clearly supply the Court with federal question jurisdiction. *See Consol. Precision Prods. Corp. v. Gen. Elec. Co.*, No. 15-CV-8721 (PKC), 2016 WL 2766662, at *2 (S.D.N.Y. May 12, 2016) ("Whether premised on diversity or federal-question jurisdiction, a federal court has subject-matter jurisdiction to decide arbitrability.").

agreement to arbitrate certain claims with Plaintiff's predecessor, this ruling focuses on the second part of the test.[3]

## III.    Discussion

Defendants argue that the arbitration clause in the Consulting Agreement executed by Plaintiff's corporate predecessor and Michael Quest requires Plaintiff's claims to be resolved by arbitration. Defendants first argue that the parties intended for the arbitrator to determine whether this case must be arbitrated. In the alternative, Defendants argue that the arbitration clause is broad and that the allegations in the amended complaint touch matters governed by the Consulting Agreement, and therefore fall within the scope of the arbitration clause. Defendants also argue that TSI and William Quest are entitled to arbitration of Plaintiff's claims against them, despite not having signed the Consulting Agreement; as noted (footnote 3, *supra*), I do not reach this last argument.

### A.  Whether the Parties Delegated Questions of Arbitrability to the Arbitrator

Defendants first argue that any "question of arbitrability" must be submitted to the arbitrator. "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alterations omitted). "'Question of arbitrability' is a term of art covering disputes about whether the parties are bound by a given arbitration clause [i.e. formation] as well as disagreements about whether an arbitration clause in a concededly binding contract applies to a particular type of

---

[3] Because I ultimately conclude that the dispute is not arbitrable at all, I do not reach the question whether the two Defendants who did not sign the arbitration agreement may nonetheless force the Plaintiff to arbitrate.

controversy [i.e. scope]." *Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) (internal quotation marks and alterations omitted).

"Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Unless the party seeking arbitration "point[s] to a clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration," the court must decide the issue of arbitrability. *NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014).[4]

The Consulting Agreement contains no provision explicitly delegating to the arbitrator the decision regarding arbitrability. It provides only that "the only mechanism to settle any dispute, controversy, or claim arising out of or relating to this Agreement shall be . . . binding arbitration . . . in accordance with the Rules of the American Arbitration Association ['AAA']." (ECF No. 23-2 at 7.) Defendants argue that the reference to the rules of the AAA means that the question of arbitrability must be left to the arbitrator. (ECF No. 23-2 at 7.) They point to an AAA rule stating that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to . . . the arbitrability of any claim or counterclaim," Rule R-7(a), AAA Commercial Arb. Rules, and to Second Circuit cases holding that such an express incorporation of rules empowering an arbitrator to decide arbitrability "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005); *see also Lapina v. Men Women N.Y. Model*

---

[4] The Consulting Agreement is governed by New York law, which "follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is a clear and unmistakable agreement to arbitrate arbitrability." *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 208 n. 1 (2d Cir. 2005) (internal quotation marks and citations omitted).

*Mgmt. Inc.*, 86 F. Supp. 3d 277, 283-84 (S.D.N.Y. 2015) ("[A] party who signs a contract containing an arbitration clause and incorporating by reference the AAA rules cannot later disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability.") (quotation omitted).

Unlike the arbitration clauses in these cases, however, the clause in this case includes a carve-out provision that expressly reserves certain issues for the courts. The arbitration clause here appears in Section 7.2 of the Consulting Agreement and expressly states that it is "[s]ubject to Section 7.1 of [the] Agreement," which provides for injunctive relief "to be issued by any competent court of equity" for any acts violating Article IV of the Agreement. *Contrast Contec Corp.*, 398 F.3d at 208 (noting that the arbitration clause subjected "any controversy arising with respect to this Agreement" to arbitration); *Lapina*, 86 F. Supp. 3d at 286 (noting that the arbitration clause provided for arbitration of all disputes "between the parties hereunder or involving this Agreement"). In a case likewise involving an arbitration clause that both incorporated AAA rules and had a carve-out provision, the Second Circuit rejected the argument that "any ambiguity as to the parties' intent respecting resolution of questions of arbitrability is eliminated by the [agreement]'s incorporation of AAA rules, which provide for arbitrability to be decided by the arbitrator." *NASDAQ*, 770 F.3d at 1032. In *NASDAQ*, the Second Circuit held that even "a broad arbitration clause" that incorporated AAA rules presented ambiguity as to whether the parties intended to have questions of arbitrability decided by an arbitrator because the clause was "subject to a qualifying provision that at least arguably covers" the dispute. 770 F.3d at 1031-32 (construing clause that provided, "[e]xcept as may be provided in the NASDAQ OMX Requirements, all claims, disputes, controversies and other matters in question between the Parties to this Agreement . . . shall be settled by final and binding arbitration . . . . [A]ny arbitration proceeding shall be

conducted in accordance with [AAA rules]").  The Second Circuit held that the party seeking arbitration in that case could not "carry [its] burden [of showing a clear and unmistakable expression of intent to submit arbitrability disputes to arbitration] by pointing to a broad arbitration clause that the parties subjected to a carve-out provision." *Id.* at 1032.  Because of the "arguably" applicable carve-out, the reference in the arbitration clause to AAA rules meant only that AAA rules would apply to "such arbitrations as may arise under the Agreement." *Id.*  Therefore, the reference to AAA rules in the Consulting Agreement does not, by itself, evidence clear and unmistakable intent to delegate the question of arbitrability to the arbitrator.

The parties have cited no case – and I have found none – in which the Second Circuit has expounded on when carve-out or other qualifying provisions "at least arguably cover[]" disputes, and thereby create enough ambiguity to forestall a showing of clear and unmistakable intent to submit the question of arbitrability to arbitration. More specifically, there appears to be little guidance on the degree of distinction between a provision that "arguably" covers a dispute and one that *actually* covers the dispute. The *NASDAQ* Court cited the Second Circuit's decision in *Katz v. Feinberg*, in which the relevant agreement contained a specific clause clearly assigning valuation determinations to accountants rather than an arbitrator, and in which the Court held that the parties did not agree to arbitrate questions of arbitrability as to the valuation provision. 290 F.3d 95, 97 (2d Cir. 2002); *see NASDAQ*, 770 F.3d at 1031. In other cases in which courts have found arbitrability to be committed to the arbitrator in spite of carve-out provisions, it was obvious that the carve-out provision did not apply to the issue at hand. *See, e.g.*, *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 727-28 (E.D.N.Y. 2017) (question of arbitrability delegated to the arbitrator where arbitration clause provided that, with the exception of "disputes relating to the interpretation or application of the Class Action Waiver or [California's Private Attorneys General

Act of 2004]," the arbitrator would decide "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision"; court decided enforceability of class action waiver and referred most of remaining "gateway arbitrability issues" to arbitrator); *Consol. Precision Prods. Corp. v. Gen. Elec. Co.*, No. 15-CV-8721 (PKC), 2016 WL 2766662, at *6 (S.D.N.Y. May 2, 2016) (finding that the parties' adoption of a "limited exception" to arbitration for intellectual property claims was not applicable to dispute involving breach of contract and declaratory judgment claims not relating to intellectual property, and therefore that arbitrability was a question for the arbitrator). None of these authorities is particularly helpful in this case, which presents a closer call.

The presumption of judicial determination of questions of arbitrability, coupled with *NASDAQ*'s use of the word "arguably," suggests that courts need not determine with certainty whether a particular dispute implicates a carve-out from arbitration in order to conclude that a question of arbitrability remains with the court. If certainty was required, the inquiry into who should decide arbitrability would be indistinguishable from the inquiry into arbitrability itself – both would turn on whether the dispute actually fell within the carve-out provision. In cases such as this one where the answer was not obvious, applying such a standard would require the litigants to embark with the court on a detailed analysis of the arbitration agreement and then, if the court finally concluded that it was for the arbitrator to decide arbitrability, travel the same road with the arbitrator. Such a drawn-out, duplicative process would run counter to the policy of economy embodied in the Federal Arbitration Act and the more general principle that the rules governing who decides should be simple and clear. *See Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 479-80 (1989) ("[The] legislative policy embodied in the Arbitration Act . . .

strongly favors the enforcement of agreements to arbitrate as a means of securing prompt, economical and adequate solution of controversies."); *cf. Direct Mkt'g. Ass'n v. Brohl*, 135 S. Ct. 1124, 1133 (2015) ("[J]urisdictional rules should be clear.") (quotation omitted); *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 464 n. 13 (1980) ("Jurisdiction should be as self-regulated as breathing; . . . litigation over whether the case is in the right court is essentially a waste of time and resources.") (quoting David P. Currie, The Federal Courts and the American Law Institute (pt. 1), 36 U. Chi. L. Rev. 1, 1 (1968)). For these reasons, I take the Second Circuit's use of "arguably" in this context to call for a considerably less searching inquiry than a fulsome analysis of whether the parties' dispute—more specifically, the part of it by which the Plaintiff seeks injunctive relief—actually falls within the carve-out provision. Here, it "arguably" does.

Section 7.1 provides that IDQ "shall be entitled to full injunctive relief, to be issued by any competent court of equity" in the event Michael Quest should "engage in or perform, either directly or indirectly," any acts that violate Article IV of the Consulting Agreement. (ECF No. 23-2 at 7.) That Article contains Michael Quest's confidentiality, non-compete, and non-solicitation obligations. (*Id*. at 4-5.) The amended complaint asks the Court to permanently enjoin Defendants from, among other conduct, infringing Plaintiff's marks and unfairly competing with Plaintiff. (ECF No. 9 at 36-37.) If that alleged infringement or unfair competition involves acts that violate Article IV, then, under Section 7.1, Plaintiff's request for injunctive relief belongs in court.

The complaint does not suggest that Michael Quest violated the non-compete or non-solicitation obligations of Article IV, but it does invoke the confidentiality obligation:

> Following the merger [between EF and Interdynamics], Michael Quest remained employed by IDQ [the Plaintiff's corporate predecessor] as Executive Vice President from 2007-2009 and continued to provide consulting services in connection with the sales of refrigerant products to IDQ from 2009-2011. Michael Quest's employment as a consultant for IDQ was governed by a consulting agreement executed on July 28, 2009 ("Consulting Agreement") which contained

> a non-compete clause with IDQ until January 1, 2014. This Consulting Agreement also subjected Michael Quest to ongoing confidentiality provisions regarding confidential information learned of during his employment at IDQ. The Consulting Agreement expressly states that this confidentiality provision remains in effect indefinitely after the termination of the Confidentiality Agreement, and is not tied in any way to the non-compete clause.

(ECF No. 9 ¶ 42.) This is the only express reference to the Consulting Agreement in the entire 40-page complaint. Nonetheless, paragraph 56 hearkens back to this reference in alleging that "Defendants' conduct supports a finding of willful infringement . . . . [B]y virtue of Michael Quest's role as a consultant for IDQ's refrigerant business, Michael Quest has actual and constructive knowledge of Plaintiff's prior rights in its HIGH MILEAGE Marks and actual and constructive knowledge of Plaintiff's sale" of its products. (*Id*. ¶ 56); *see als*o ¶ 46 (alleging Michael Quest's "extensive knowledge of Plaintiff's trademarks, trade dress and products" as one of the bases for the allegation that "the resemblance between the marks and trade dress on Plaintiff's ARCTIC FREEZE products and the marks and trade dress used on Avalanche's products is not the result of mere coincidence"). As I discuss in the next section, the complaint's express reference, in paragraph 42, to the confidentiality provisions of Article IV is not, in the end, necessary to support the allegation, in paragraph 56, that Michael Quest "has actual and constructive knowledge of Plaintiff's prior rights in its HIGH MILEAGE Marks and actual and constructive knowledge of Plaintiff's sale" of its branded products and, thus, not essential to the claim that he willfully infringed Plaintiff's intellectual property rights; nor is it necessary to support the allegation, in paragraph 46, that he had "extensive knowledge of Plaintiff's trademarks, trade dress and products." Nonetheless, the allegation in paragraph 42 about Quest's confidentiality obligations steers the case close enough to a theory that his infringement has relied, in part, on his misuse of confidential information in violation of Article IV to bring Plaintiff's request for injunctive relief against infringement "arguably" within the carve-out for injunctions

against acts violating Article IV. Further, given the purposes of the injunctive relief contemplated by Article IV, including the need to enable Plaintiff to prevent or put a prompt end to unauthorized disclosures of its proprietary information, there is reason to doubt that the parties intended that Plaintiff would first have to call upon an arbitrator, who would lack the power to afford such prompt equitable relief, to decide the arbitrability of disputes that arguably implicated the need for such relief. In any event, because the issue is at least debatable, I conclude that the Defendants have not borne their burden of showing that the parties clearly and unmistakably delegated the decision concerning arbitrability to the arbitrator.[5] I thus turn to the question whether the parties' dispute actually falls within the scope of the arbitration clause.

### B. Whether the Particular Dispute is Subject to Arbitration

"To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry." *Louis Dreyfus Negoce S.A.*, 252 F.3d at 224. First, "a court should classify the particular [arbitration] clause as broad or narrow." *Id.* Second, if the clause at issue is narrow, "the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." *Id.* (internal quotation marks omitted). "Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *Id.* Where the arbitration clause is broad, however, "there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if

---

[5] It does not matter that the damages portion of the dispute plainly falls outside the carve-out provision. I am unaware of any case—and the parties have cited none—in which a court found that two different decision makers, a court and an arbitrator, should decide the issue of arbitrability as to different parts of the same dispute; that would needlessly complicate the threshold inquiry into who decides. As long as some part of the dispute "arguably" falls within a carve-out reserved for court resolution, then the presumption of judicial determination of questions of arbitrability should apply with respect to the entire dispute.

the claim alleged implicates issues of contract construction or the parties' rights and obligations under it." *Id.* (internal quotation marks omitted).

### 1. Scope of the Arbitration Clause

"No fixed rules govern the determination of an arbitration clause's scope; while very expansive language will generally suggest a broad arbitration clause . . . [the Second Circuit has] also found broad clauses when examining phrasing slightly more limited." *Louis Dreyfus Negoce S.A.*, 252 F. 3d at 225 (internal citations omitted). "In the end, a court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Id.* (holding that an arbitration clause mandating that "[a]ny dispute arising from the making, performance or termination of" the agreement be arbitrated was a broad clause). A broad arbitration clause is one that "purport[s] to refer all disputes arising out of a contract to arbitration," while a narrow clause "limit[s] arbitration to specific types of disputes." *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d 825, 832 (2d Cir. 1988).

As noted, the arbitration clause in the Consulting Agreement states that "[s]ubject to Section 7.1 of this Agreement, the only mechanism to settle any dispute, controversy or claim arising out of or relating to this Agreement shall be settled by binding arbitration . . . ." (ECF No. 23-2 at 7.) A clause covering "any claim or controversy arising out of or relating to the agreement" is "the paradigm of a broad clause." *Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011) (quoting *Collins v. Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995)). Further, "an arbitration clause covering claims 'relating to' a contract is broader than a clause covering claims 'arising out of' a contract." *Alghanim*, 828 F. Supp. 2d at 652. A clause covering

claims or controversies "arising out of or relating to" a contract is "even broader." *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845, 848 (2d Cir. 1987). Plaintiff argues that Section 7.2 contains a narrow arbitration clause, but arbitration clauses that courts have considered "narrow" typically require arbitration for particular disputes only. *See, e.g.*, *Microsoft Corp. v. Samsung Elec. Co., Ltd.*, 60 F. Supp. 3d 525, 529 (S.D.N.Y. 2014) (finding an arbitration clause narrow where it provided for arbitration of "specific disputes related to reporting, accounting, and auditing"). Thus, without consideration of the carve-out, Section 7.2 contains a broad arbitration clause.

The carve-out in Section 7.2 subjecting that clause to Section 7.1 does not substantially narrow the scope of the arbitration clause, as Section 7.1 provides for adjudication in court for claims for injunctive relief only for violations of Article IV. This exception leaves broad leeway for the arbitration clause, which covers all other disputes "arising out of or relating to" the Consulting Agreement. *See Hook v. UBS Fin. Servs., Inc.*, No. 3:10CV950 (JBA), 2011 WL 1741997, at *4 (D. Conn. May 4, 2011) (finding arbitration clause to be broad despite a carve-out for claims for injunctive relief); *Allcity Family Healthcare Ctr., LLC v. Boss Surgical Grp.*, No. 12-CV-6428 (NGG)(JMA), 2014 U.S. Dist. LEXIS 112293, at *17-18 (E.D.N.Y. Aug. 13, 2014) (interpreting an "injunctive relief" provision as an exception to a broad arbitration clause).

I find that the arbitration clause at issue here is broad. I consider next whether the arbitration clause covers the parties' dispute.

### 2. Whether the Arbitration Clause Covers Plaintiff's Claims

Where an arbitration clause is broad, the resulting "presumption of arbitrability . . . is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71,

74 (2d Cir. 1997) (internal quotation marks omitted). Because the Court has concluded that the arbitration clause is broad, it is Plaintiff's burden to demonstrate that the dispute is not covered by the scope of the arbitration clause.

To determine whether the claims fall within the scope of the arbitration clause, the Court "focuses on the factual allegations in the complaint rather than the legal causes of action asserted." *Specht v. Netscape Comm. Corp.*, 306 F.3d 17, 36 (2d Cir. 2002) (quoting *Genesco*, 815 F.2d at 846). "If the allegations underlying the claims touch matters covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (alteration omitted).

> More specifically, if the dispute is, on its face,
>
> clearly collateral to the contract, then a court should test the presumption [of arbitrability] by reviewing the allegations underlying the dispute and by asking whether the claim alleged implicates issues of contract construction or the parties' rights and obligations under it. If the answer is yes, then the collateral dispute falls within the scope of the arbitration agreement; claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement.

*Collins v. Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995). Thus, despite the requirement of "positive assurance that [a broad] arbitration clause is not susceptible of an interpretation that covers the asserted dispute," *WorldCrisa Corp.*, 129 F.3d at 74, courts determining whether "clearly collateral" claims are arbitrable – even when the arbitration clause is broad – focus on whether adjudicating the claims would require construction of the contract. *See, e.g.*, *FUJIFILM N. Am. Corp. v. Geleshmall Enter. LLC*, 239 F. Supp. 3d 640, 647-50 (E.D.N.Y. 2017); *Benihana of Tokyo, LLC v. Benihana Inc.*, 73 F. Supp. 3d 238, 253-57 (S.D.N.Y. 2014); *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 461-67 (E.D.N.Y. 2009). "When a dispute consists of several claims, the court must determine on an issue-by-issue basis whether a party

bears a duty to arbitrate, compelling arbitration of arbitrable claims, and permitting litigation of non-arbitrable claims." *LG Elecs., Inc. v. Wi-Lan USA, Inc.*, 623 Fed. Appx. 568, 571 (2d Cir. 2015) (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 142 (2d Cir. 2011)).

The allegations in the amended complaint are "clearly collateral" to the Consulting Agreement. Under the Consulting Agreement, Michael Quest agreed to work as a consultant for IDQ from 2009 to 2011. The Consulting Agreement does not concern Plaintiff's rights to particular trademarks, trade dress, or creative works, the primary subject of this dispute. Further, the complaint alleges statutory and common law claims for the violation of Plaintiff's intellectual property rights and unfair competition, and includes no claim for breach of contract or for a declaration of rights under the Consulting Agreement. The question is thus whether, though "clearly collateral," each claim in the complaint "implicates issues of contract construction or the parties' rights and obligations under [the Consulting Agreement]." *Collins*, 58 F.3d at 23. I consider this question as to each claim below.

### a. Unfair competition, false advertising, false patent marking, and unjust enrichment claims

The unfair competition, false advertising, and false patent marking claims under the Lanham Act, the common law, CUTPA, and the federal false patent marking statute (Counts Three, Five, Eight, Nine, and Eleven), as well as the unjust enrichment claim (Count Ten), do not fall within the scope of the arbitration clause. The unfair competition, false advertising, and false patent marking claims are based on allegations that (1) Defendants "are using counterfeit and infringing marks imitating the HIGH MILEAGE Marks and the ARCTIC FREEZE Mountain Mark in connection with the advertising and sale of refrigerant products in a manner that creates a likelihood of confusion among prospective purchasers, thereby inducing purchasers . . . to believe" products sold by Defendants are somehow connected to Plaintiff (ECF No. 9 ¶ 82, 110); (2)

Defendants have made false or misleading statements that Defendants' products "provide '#1 SUPER CHILL,' 'Maximum Cooling," and 'extend[] the life of [a customer's] system" (*id*. ¶ 92.); and (3) Defendants falsely marked their unpatented products with the phrase "patent pending." (*Id*. ¶¶ 94, 111, 115, 126-29.) Whether or not Defendants' advertising and sale of their products create a likelihood of confusion with Plaintiff's products and whether Defendants' products actually have superlative cooling properties or are patented have nothing to do with Michael Quest's and IDQ's prior relationship, let alone the terms of the Consulting Agreement. *See CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 175 (3d Cir. 2014) ("[T]he adjudication of CIGNA's direct claims depends on whether the Physician Update – a document completely distinct from the Agreement [requiring arbitration of disputes relating to performance or its interpretation] – is deceptive and misleading, and whether any deceptions therein caused a cognizable injury to the Providers. The resolution of these claims does not require construction of, or even reference to, any provision in the Agreement."); *Benihana of Tokyo, LLC*, 73 F. Supp. 3d at 255 ("The truth or falsity of Benihana of Tokyo's boasts . . . has nothing to do with . . . the terms and conditions of the License Agreement . . . ."). None of these allegations "implicates issues of contract construction or the parties' rights and obligations under [the Consulting Agreement]," *Collins*, 58 F.3d at 23, and none even depends on the relationship between Michael Quest and Plaintiff. These claims are thus not arbitrable.

I reach the same conclusion as to the unjust enrichment claim. In Count Ten, Plaintiff alleges that by selling its competing products, Defendants have traded on the value and goodwill that Plaintiff generated in its HIGH MILEAGE Marks and the ARCTIC FREEZE Mountain Mark. (*Id*. ¶¶ 120-21.) Thus, Plaintiff alleges that Defendants diverted revenue to which Plaintiff is entitled and generated benefits at Plaintiff's expense. (*Id*. ¶ 121.) The unjust enrichment claim does not depend on the Consulting Agreement either. Plaintiff could make such a claim regardless

whether Michael Quest had had a relationship with Plaintiff or its predecessors. Indeed, Plaintiff alleges that it or its predecessors have been using some of the marks at issue, and thereby generating goodwill, since as early as 2005 – years before Michael Quest entered into the Consulting Agreement. (*Id*. ¶ 28.) The unjust enrichment claim is therefore also not arbitrable.

      **b. Trademark, Trade Dress, and Copyright infringement and Counterfeiting Claims**

Plaintiff's Lanham Act and common law trademark, trade dress infringement and counterfeiting, as well as his Copyright Act claims (Counts One, Two, Four, Six, and Seven), present a closer call, because they include a claim of willfulness based, in part, on Michael Quest's prior consulting relationship with IDQ. (ECF No. 9 ¶¶ 42, 56). They also suggest that the infringement and counterfeiting resulted in part from Michael Quest's "extensive knowledge" of Plaintiff's products and intellectual property (*id.* ¶ 46), which he allegedly gained, in part, from his time as a consultant.

The infringement and counterfeiting claims allege that Defendants "copied Plaintiff's HIGH MILEAGE Marks" and "Plaintiff's ARCTIC FREEZE Mountain Mark" and used them to market counterfeit and infringing products with a "deliberate intent to cause confusion . . . among prospective customers." (ECF No. 9 ¶¶ 67-68, 104.) Similarly, Plaintiff alleges that Defendants have "made unauthorized use of spurious marks" that are "substantially indistinguishable from Plaintiff's federally registered HIGH MILEAGE Marks." (*Id*. ¶ 74.) With respect to trade dress and the labels that form the basis of the copyright claim, Plaintiff alleges that "Defendants have used in commerce trade dress that imitates" Plaintiff's trade dress and "imitate[d] the red diagonal lettering, the display of the word MILEAGE in an odometer format and the black background aspects of the A/C Pro Trade Dress and the High Mileage Trade Dress." (*Id*. ¶¶ 88, 50.) Defendants' use of the marks and trade dress has allegedly created a likelihood of confusion and

deception among actual and prospective consumers and has damaged Plaintiff's goodwill as a result, and Defendants' labels are "substantially similar to one or more of Plaintiff's Creative Works." (*Id*. ¶¶ 69, 74, 88, 101, 105-06.) Plaintiff also alleges that Defendants had actual knowledge of Plaintiff's rights in this intellectual property, and therefore that Defendants' conduct was willful and deliberate. (*Id*. ¶¶ 71, 78, 90.) With respect to Michael Quest, Plaintiff bases the willfulness claim, in part, on the allegation that he gained "actual and constructive knowledge of Plaintiff's prior rights in its HIGH MILEAGE Marks and actual and constructive knowledge of Plaintiff's sale" of its branded products "by virtue of [his] role as a consultant for IDQ's refrigerant business," (*id*. ¶ 56), a role the complaint alleges was governed by the Consulting Agreement. (*Id*. ¶ 42.) The allegation of Quest's "extensive knowledge" about Plaintiff's "trademarks, trade dress and products" (*id*. ¶ 46) does not specify where he gained that knowledge, but it is reasonable to read that allegation as also being based in part on Quest's position as a consultant.[6]

In the end, however, I conclude that the allegation that Quest gained "actual knowledge" of Plaintiff's intellectual property rights and products through his work as a consultant and later allegedly willfully misused that knowledge to infringe Plaintiff's products does not implicate the rights or obligations of the parties to the Consulting Agreement or call upon the Court to construe it. True, that allegation includes a specific reference to the Consulting Agreement, which, according to the complaint, "subjected Michael Quest to ongoing confidentiality provisions regarding confidential information learned of during his employment at IDQ," provisions that remain in effect indefinitely. (Id. ¶ 42.) As noted above, that is a reference to Article IV of the

---

[6] The complaint also alleges that Quest was an employee of IDQ from 2007 to 2009 (and before that, an employee of IDQ's corporate predecessor, by way of acquisition), and that he gained actual and constructive knowledge of Plaintiff's intellectual property in that way as well. (ECF No. 9 at ¶ 41.)

Consulting Agreement, which includes a provision requiring Quest to maintain the confidentiality of "Confidential Information," a term defined to include "business and marketing plans, strategies, employee lists, . . . know-how, confidential records, . . . trade secrets, processes, policies and/or personnel, . . . intellectual property, . . . marketing information, sales techniques, business organization, and other proprietary and confidential information relating to [Plaintiff]." (ECF No. 23-2 at 4.)  Article IV requires him to maintain the confidentiality of all such information "during the Term[7] and at all times thereafter" "except to the extent that . . . the information becomes generally available to the public other than as a result of disclosure by Consultant." (*Id*. at 4-5.)  Further, Michael Quest acknowledges in the Consulting Agreement that, "as a result of [his] service with [Plaintiff], he will obtain, and that as a result of his prior employment with [Plaintiff] he has obtained, secret, proprietary and confidential information concerning" Plaintiff's business. (ECF No. 23-2 at 4.)

Although the complaint references the confidentiality obligations in Article IV, neither the willfulness claim (ECF No. 9 ¶¶ 42, 56) nor the claim that the infringement resulted from Quest's "extensive knowledge" of Plaintiff's rights and products (*id*. ¶ 46) depends on these obligations.  More specifically, neither claim turns on whether the information Michael Quest learned as a consultant about the Plaintiff's products and intellectual property rights was "confidential" within the meaning of Article IV.  To show willfulness, Plaintiff need show only that Michael Quest did, in fact, learn the information at some point before the infringement occurred and that he was aware of the infringing activity.  *See Island Software and Computer Service, Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005) ("To prove 'willfulness' under

---

[7] Section 3.1 of the Consulting Agreement defines the "Term" as the "period commencing on the Effective Date [July 28, 2009] and, unless earlier terminated as provided [in the Agreement] terminating on December 31, 2011." (ECF No. 23-2 at 3.)

the Copyright Act, the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's rights."); *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 Fed. Appx. 26, 31 (2d Cir. 2013) (applying same standard to trademark infringement under Lanham Act). The same showing would satisfy the element of "actual copying" for the copyright claim. *Boisson v. Banian*, Ltd., 273 F.3d 262, 269 (2d Cir. 2001) ("[i]ndirect evidence of access [to a protected work]" may, together with evidence of "substantial similarity" between the works, "support an inference that copying took place." (internal quotation marks omitted)). Plaintiff does not need to show that the information is "confidential" under Article IV or that Quest violated Article IV to establish these elements. It will be the fact that Michael Quest worked for Plaintiff –as an employee and later as a consultant – and not the content of the agreement governing their relationship that makes it more likely that he acquired knowledge of Plaintiff's products and intellectual property and, thus, acted willfully or actually copied Plaintiff's products or packaging. Even if Plaintiff marshals as evidence Quest's acknowledgement in the Consulting Agreement that "he will obtain [and] . . . has obtained, secret, proprietary and confidential information concerning the business of the Company" (ECF No. 23-2 at 4), that would not require the Court to construe or apply the provisions of the agreement in order to resolve Plaintiff's claims.[8] Nor would it implicate the parties' rights and obligations under the Consulting Agreement. *See CardioNet, Inc.*,

_____

[8] Further, Plaintiff would not need to point to the Consulting Agreement to prove Michael Quest's actual knowledge of its products and intellectual property rights. The information Michael Quest is alleged to have acquired – "knowledge of Plaintiff's prior rights in HIGH MILEAGE Marks and … of Plaintiff's sale" of its branded products – was allegedly publicly available. (ECF No. 9 at ¶ 20 (alleging that HIGH MILEAGE marks were registered in 2011 and 2012), ¶¶ 53-54 (alleging that Plaintiff displays and sells its products through publicly accessible retail stores)). Further, the complaint alleges that Michael Quest also acquired this information while he was an employee of Plaintiff's predecessor – before he entered into the Consulting Agreement. (Id. ¶¶ 41-42.)

751 F.3d at 175 n.9 ("[T]he fact that the Complaint references the Agreements extensively is of no moment . . . . The Complaint does indeed discuss the Agreement, but it hardly follows from this that the parties' performance or interpretation of the Agreement is implicated by the [plaintiffs'] claims."); *Ford v. NYLCare Health Plans of Gulf Coast, Inc.,* 141 F.3d 243 (5th Cir. 1998) (applying Texas law and noting that the test for whether a tort claim is arbitrable focuses on the factual allegations of the complaint, "not to identify whether the facts in support of the action will implicate the agreement [containing the arbitration clause] as an item of evidence, but to uncover whether an action formally labeled a tort is in essence a breach of contract claim or based on a breach of contract"); *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 461-63 (E.D.N.Y. 2009) ("[A]lthough plaintiffs' claims include an allegation that the [defendants] promoted animal performances [for others] during the contract period," an allegation that "could support a breach of contract claim" for violation of an exclusivity provision in the agreement, "this fact does not form the basis for plaintiffs' claims . . . . The existence of the contract was not a factual predicate for this dispute…. In this case, the crux of plaintiffs' complaint is not that the Gelfmans promoted animal performances during the contract period, but rather that the Gelfmans allegedly stole plaintiffs' intellectual material."); *see also Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) (holding that defamation claim that was "factually quite closely related to the contract claims, although legally distinct from them" was not arbitrable, because the defamatory statements alleged "implicate[d] matters beyond the contractual performance of the parties").

If the Plaintiff does seek to prove these claims by establishing that Michael Quest violated Article IV of the Consulting Agreement, then the Court may have to revisit this issue – and, in particular, sever the damages portions of the infringement and counterfeiting claims for arbitration

and leave the injunctive portions for the Court, as contemplated by Section 7.1 of the Agreement. But as the amended complaint is currently pled, and in spite of the specific reference to the confidentiality obligations of Article IV in paragraph 42, no provision of the Consulting Agreement is necessary to support any element of the infringement or counterfeiting claims. Those claims thus "present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it." *Collins*, 58 F.3d at 23; *see also CardioNet, Inc.*, 751 F.3d at 176 (holding that Lanham Act, tort, and trade disparagement claims were not arbitrable as they did not concern the performance or interpretation of the parties' agreement: ); *Kuklachev*, 600 F. Supp. 2d at 464 ("No contract interpretation is required to adjudicate the parties' rights to the mark, nor does plaintiffs' claim of rights to the . . . mark present any question as to the parties' rights and duties under the contract."). The infringement and counterfeiting claims are, therefore, not arbitrable.

\* \* \*

I acknowledge the apparent tension between my conclusions in Sections III.A. and III.B. In Section III.A., I concluded that the defendants have not shown that the parties "clearly and unmistakably" delegated the question of arbitrability to the arbitrator because of the complaint's allegations that "arguably" suggest conduct violating Article IV of the Agreement and thus, to the extent the complaint seeks injunctive relief, arguably fall within the carve-out for court resolution. In Section III.B., I concluded that the adjudication of this case will not ultimately require an interpretation of Article IV and thus does not actually fall within the carve-out or any other part of the Agreement; and I reached this conclusion with "positive assurance."

I also conclude, however, that, this apparent tension is reconcilable based on the Second Circuit's teachings on the two issues involved. The resolution of the first issue — who decides

— is driven here by three factors: (1) the parties' selection in the agreement of two different fora for different kinds of disputes, (2) the presence in the complaint of allegations that "arguably" make the injunctive part of the case the type of dispute the agreement commits to courts, and (3) the default rule that where the parties did not "clearly and unmistakably" delegate the question of arbitrability to the arbitrator, it must remain with the court. The resolution of the second issue - whether part or all of the dispute is arbitrable - is driven by a different set of considerations set forth in Second Circuit case law and discussed above. Ultimately, these considerations train on whether adjudicating each claim in the case will actually require the court to construe the agreement; here, the question is not what is "arguable" but whether any element of a claim will actually entail interpreting a provision of the agreement.

Accordingly, while it may seem counter-intuitive to hold that part of a dispute "arguably" implicates the carve-out provision in the agreement but that adjudicating the dispute will ultimately not call upon the court to interpret the agreement, I find that doing so in this case is consistent with both the governing law and the parties' intentions as expressed in the agreement.

## IV.    Conclusion

For the reasons stated above, Defendants' motion to compel arbitration (ECF No. 22) is DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              August 30, 2018