## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| THE ARMOR ALL/STP PRODUCTS COMPANY, | |
| Plaintiff, | Civil Action No. 3:17-cv-01131-MPS (Lead) |
| v. | Civil Action No. 3:18-cv-01682-MPS (Consolidated) |
| TSI PRODUCTS, INC., et al., | |
| Defendants. | |

## CONSOLIDATED PLAINTIFF TSI PRODUCTS, INC.'S
## OPPOSITION TO THE ARMOR ALL DEFENDANTS' MOTION TO DISMISS THE
## SECOND AMENDED COMPLAINT

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     LEGAL STANDARDS ......................................................................... 4

III.    ARGUMENT ....................................................................................... 5

        A.      TSI Alleges Sufficient Facts to Support Claims Based on Keyword
                Advertising.................................................................................. 5

                1.      Standards Regarding Infringement in Search Engine Advertising ............ 6

                2.      TSI Sufficiently Alleges a Likelihood of Confusion ................................. 7

        B.      TSI has Sufficiently Pled Ownership and First Use of the Mountain Logos.......... 9

                1.      The Assignment Encompassed the AVALANCHE Mountain Logo ....... 11

                2.      Any Ambiguity Should be Interpreted in TSI's Favor and the Motion
                        Denied to Permit Discovery..................................................... 14

                3.      TSI Plausibly Alleges Ownership Through Prior Use ............................. 15

        C.      Defendants' False Advertising Claims are Not Mere Puffery ............................ 16

                1.      Second Circuit Law on Puffery.................................................... 17

                2.      The Low-Pressure-Measuring Gauge Recharge Kit Claims.................... 19

                3.      The Coldest Air Claims are Measurable ............................................. 22

        D.      TSI's Antitrust Claims Under the Sherman Act Should Not be Dismissed ........ 25

                1.      TSI Sufficiently Pled a Relevant Market ....................................... 25

                2.      TSI Sufficiently Pled an Antitrust Injury................................... 30

                3.      TSI Sufficiently Pled Unlawful, Anticompetitive Conduct.................... 32

                        a.      TSI'S Section 1 Claim Sufficiently Pleads an Anticompetitive
                                Vertical Restraint on Trade......................................... 32

                        b.      TSI's Section 2 Monopolization Claims Sufficiently Identify
                                Anticompetitive Behavior .......................................... 35

        E.      TSI'S CUTPA Claim is Sufficiently Pled ....................................... 38

IV.     CONCLUSION.................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*1-800 Contacts, Inc. v. Lens.Com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ......................................................................... 6

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*,
    592 F.3d 991 (9th Cir. 2010) ........................................................................... 33

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*,
    No. 10 Civ. 3314 (RWS), 2015 U.S. Dist. LEXIS 84172, 2015 WL 4033019
    (S.D.N.Y. Jun. 26, 2015) ................................................................................... 8

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
    2005 U.S. Dist. LEXIS 42852 (S.D.N.Y. June 23, 2005)................................. 37

*Anthem Sports, LLC v. Under the Weather, LLC*,
    320 F. Supp. 3d 399 (D. Conn. 2018)............................................................... 16

*Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*,
    317 Conn. 602, 119 A.3d 1139 (2015) ............................................................ 40

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)........................................................................................... 4

*Avola v. La.-Pacific Corp.*,
    991 F. Supp. 2d 381 (E.D.N.Y. 2013) ................................................. 17, 18, 20

*Avon Prods. v. S.C. Johnson & Son, Inc.*,
    1994 U.S. Dist. LEXIS 7950 (S.D.N.Y. June 9, 1994)..................................... 18

*Bailey v. Interbay Funding LLC*,
    No. 3:17-CV-1457, 2018 WL 1660553 (D. Conn. Apr. 4, 2018).................... 10

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012)............................................................................... 14

*Bell Atl. Corp*. v. *Twombly*,
    550 U.S. 544 (2007)........................................................................................... 4

*Bluewater Key RV Ownership Park Prop. Owners Ass'n v. Clark*,
    No. 15-10060-CIV-GOODMAN, 2016 U.S. Dist. LEXIS 123138, 2016 WL
    4761853 (S.D. Fla. Sept. 12, 2016).................................................................. 16

*Bridal Expo, Inc. v. Van Florestein*,
    No. 4:08-cv-03777, 2009 U.S. Dist. LEXIS 7388, 2009 WL 255862 (S.D. Tex.
    Feb. 3, 2009) .................................................................................................... 23

*Bridge Metal Indus., LLC v. Travelers Indem. Co.*,
    559 F. App'x 15 (2d Cir. 2014) ....................................................................... 13

*Brown Shoe Co. v. U.S.*,
    370 U.S. 294 (1962)................................................................................... 26, 27

*Bruce Kirby, Inc. v. LaserPerformance Ltd.*,
   No. 3:13-cv-00297 (JAM), 2016 U.S. Dist. LEXIS 106839 (D. Conn. Aug. 12,
   2016) ........................................................................................................................ 11

*Castrol Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993) ......................................................................... 17, 18, 20, 23

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir. 1992) ........................................................................................... 24

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ......................................................................................... 10

*Church & Dwight Co. v. Mayer Labs., Inc.*,
   No. C-10-4429 EMC, 2011 U.S. Dist. LEXIS 35969 (N.D. Cal. Apr. 1, 2011) ........ 33, 34

*Clorox Co. v. Proctor & Gamble Commer. Co.*,
   228 F.3d 24 (1st Cir. 2000) .......................................................................................... 21

*Clorox Co. v. Sterling Winthrop, Inc.*,
   117 F.3d 50 (2d Cir. 1997) ........................................................................................... 35

*Commercial Data Servers, Inc. v. IBM*,
   00 Civ. 5008 (CM) (LMS), 2002 U.S. Dist. LEXIS 5600 (S.D.N.Y. Mar. 15,
   2002) ........................................................................................................................ 36

*ComPsych Corp. v. Health Champion LLC*,
   No. 3:12 cv 692(VLB), 2012 U.S. Dist. LEXIS 176580, 2012 WL 6212653 (D.
   Conn. Dec. 13, 2012) .................................................................................................. 16

*Concord Assocs., L.P. v. Entm't Properties Trust*,
   817 F.3d 46 (2d Cir. 2016) ........................................................................................... 25

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*,
   2003 U.S. Dist. LEXIS 17498 (S.D.N.Y. 2003) ............................................................. 14

*Dual Groupe, LLC v. Gans-Mex LLC*,
   932 F. Supp. 2d 569 (S.D.N.Y. 2013) ...................................................................... 15, 16

*Edible Arrangements LLC v. Provide Commerce, Inc.*,
   No. 3:14-CV-00250 (VLB), 2016 U.S. Dist. LEXIS 99291 (D. Conn. 2016) .............. 7, 9

*Elastic Wonder, Inc. v. Posey*,
   No. 13 Cv. 5603 (JGK), 2015 U.S. Dist. LEXIS 7366, 2015 WL 273691
   (S.D.N.Y. Jan. 22, 2015) ............................................................................................. 16

*Elecs. Communs. Corp. v. Toshiba Am. Consumer Prods.*,
   96 Civ. 1565 (RPP), 1996 U.S. Dist. LEXIS 11527 (S.D.N.Y. Aug. 12, 1996) ............. 33

*Eskofot A/S v. E.I. Du Pont De Nemours & Co.*,
   872 F. Supp. 81 (S.D.N.Y. 1995) .................................................................................. 33

*Fair Isaac Corp. v. Experian Info. Sols., Inc.*,
   645 F. Supp. 2d 734 (D. Minn. 2009) ............................................................................ 6

*Fed. Ins. Co. v. Am. Home Assurance Co.*,
   639 F.3d 557 (2d Cir. 2011) ................................................................ 14

*Fido's Fences, Inc. v. Radio Sys. Corp.*,
   999 F. Supp. 2d 442 (E.D.N.Y. 2014) .............................................. 31, 32

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   783 F.3d 395 (2d Cir. 2015).............................................................. 5, 10

*FLLI Moretti Cereali S.p.A. v. Cont'l Grain Co.*,
   563 F.2d 563 (2d Cir. 1977)................................................................ 14

*FLM Collision Parts, Inc. v. Ford Motor Co.*,
   543 F.2d 1019 (2d Cir. 1976)............................................................... 38

*Friedl v. City of N.Y.*,
   210 F.3d 79 (2d Cir. 2000).................................................................. 29

*FTC v. CCC Holdings Inc.*,
   605 F. Supp. 2d 26 (D.D.C. 2009) ....................................................... 28

*FTC v. H.J. Heinz Co.*,
   116 F. Supp. 2d 190 (D.D.C. 2000), *rev'd on other grounds,* 246 F.3d 708 (D.C.
   Cir. 2001) ........................................................................................... 28

*FTC v. Staples, Inc.*,
   970 F. Supp. 1066 (D.D.C. 1997) ........................................................ 26

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013).................................................................. 30

*Gen. Steel Domestic Sales v. Chumley*,
   Civil Action No. 10-cv-01398-PAB-KLM, 2013 U.S. Dist. LEXIS 64932 (D.
   Colo. 2013) ........................................................................................... 8

*Glob. Network Communs., Inc. v. City of N.Y.*,
   458 F.3d 150 (2d Cir. 2006)................................................................. 10

*Goldline, LLC v. Regal Assets, LLC*,
   No. CV 14-03680 DDP (ASx), 2015 U.S. Dist. LEXIS 52417, 2015 WL 1809301
   (C.D. Cal. Apr. 21, 2015) ...................................................................... 8

*Great Minds v. FedEx Office & Print Servs.*,
   886 F.3d 91 (2d Cir. 2018)................................................................... 14

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
   879 F.2d 1005 (2d Cir. 1989)............................................................... 38

*Halebian v. Berv*,
   644 F.3d 122 (2d Cir. 2011)................................................................... 5

*Hall v. Bed Bath & Beyond, Inc.*,
   705 F.3d 1357 (Fed. Cir. 2013)............................................................ 21

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*,
   258 F. Supp. 2d 1197 (D. Kan. 2003) ................................................... 23

*Home Show Tours, Inc. v. Quad City Virtual, Inc.,*
  827 F. Supp. 2d 924 (S.D. Iowa 2011) ........................................................... 23

*Horowitz v. Am. Int'l Grp., Inc.,*
  498 F. App'x 51 (2d Cir. 2012) ..................................................................... 12

*In re DDA VP Direct Purchaser Antitrust Litig.,*
  585 F.3d 677 (2d. Cir. 2009).......................................................................... 31

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.,*
  596 F. Supp. 2d 497 (D. Conn. 2009).................................................. 4, 39, 40

*Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC,*
  823 F.3d 153 (2d Cir. 2016)............................................................................ 6

*Island Software & Comput. Serv. v. Microsoft Corp.,*
  413 F.3d 257 (2d Cir. 2005)......................................................................... 10

*Kramer v. Time Warner,*
  937 F.2d 767 (2d Cir. 1991).......................................................................... 10

*L.A. Limousine, Inc. v. Liberty Mut. Ins. Co.,*
  509 F.Supp.2d 176 (D. Conn. 2007).............................................................. 39

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
  113 F.3d 373 (2d Cir. 1997).......................................................................... 40

*Law Debenture Tr. Co. v. Maverick Tube Corp.,*
  595 F.3d 458 (2d Cir. 2010)..................................................................... 12, 14

*LBF Travel v. Fareportal, Inc.,*
  No. 13 Civ. 9143 (LAK) (GWG), 2014 U.S. Dist. LEXIS 156583 (S.D.N.Y. Nov.
  5, 2014) .......................................................................................................... 6

*Lipton v. Nature Co.,*
  71 F.3d 464 (2d Cir. 1995)....................................................................... 17, 18

*Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie,*
  784 F.3d 78 (2d Cir. 2015)............................................................................ 14

*Manier v. L'Oreal U.S.A., Inc. (In re Amla Litig.),*
  No. 16-cv-6593 (JSR), 2017 U.S. Dist. LEXIS 116139 (S.D.N.Y. July 17, 2017).......... 18

*Martinez v. Yale-New Haven Hosp., Inc.,*
  No. (X02)CV0404001227S, 2005 Conn. Super. LEXIS 2354 (Super. Ct. Sep. 1,
  2005)............................................................................................................. 39

*Mayor & City Council of Baltimore v. Citigroup, Inc.,*
  709 F.3d 129 (2d Cir. 2013)............................................................................ 4

*Morse/Diesel, Inc. v. Trinity Indus.,*
  67 F.3d 435 (2d Cir. 1995)............................................................................ 12

*Murphy v. Provident Mutual Life Insurance Co.,*
  923 F.2d 923 (2d Cir. 1991).......................................................................... 39

*Nat'l Loan Inv'rs, L.P. v. FDIC*,
    53 F. App'x 146 (2d Cir. 2002) ...................................................................... 14

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) .................................................................. 7, 8

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ................................................................ 31, 32

*Nielsen v. Rabin*,
    746 F.3d 58 (2d Cir. 2014)..................................................................... 4, 10

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002).......................................................................... 21

*Nymbus, Inc. v. Sharp*,
    No. 3:17-cv-01113 (JAM), 2018 U.S. Dist. LEXIS 18302, 2018 WL 705003 (D.
    Conn. Feb. 5, 2018)...................................................................................... 14

*Omni Healthcare, Inc. v. Health First, Inc.*,
    No. 6:13-cv-1509-Orl-37DAB, 2015 U.S. Dist. LEXIS 7284 (M.D. Fla. Jan. 21,
    2015) ............................................................................................................ 37

*One Source Envtl., LLC v. M + W Zander, Inc.*,
    13 F. Supp. 3d 350 (D. Vt. 2014).................................................................. 15

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ........................................................................ 17

*Ramirez v. Health Net of the Northeast, Inc.*,
    285 Conn. 1, 938 A.2d 576 (Conn. 2008)...................................................... 39

*Rescuecome Corp. v. Google Inc.*,
    562 F.3d 123 (2d Cir. 2009)...................................................................... 6, 7

*Rexall Sundown, Inc. v. Perrigo Co.*,
    651 F. Supp. 2d 9 (E.D.N.Y. 2009) .............................................................. 23

*Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*,
    No. 09-CV-1410 (KAM), 2012 U.S. Dist. LEXIS 174295 (E.D.N.Y. 2012)................... 15

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)......................................................................... 10

*RxUSA Wholesale, Inc. v. Alton Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) .......................................................... 37

*Scotch & Soda B.V. v. Scotch & Iron LLC*,
    No. 1:17-cv-04561 (ALC), 2018 U.S. Dist. LEXIS 82033, 2018 WL 2224997
    (S.D.N.Y. May 15, 2018)......................................................................... 6, 7

*Seiden Assocs. v. ANC Holdings, Inc.*,
    959 F.2d 425 (2d Cir. 1992)......................................................................... 14

*Sik Gaek, Inc. v. Yogi's II, Inc.*,
  No. CV-10-4077 (ARR) (VVP), 2013 U.S. Dist. LEXIS 78557 (E.D.N.Y. Feb.
  28, 2013) ............................................................................................................ 16

*Sikhs for Justice v. Nath*,
  893 F. Supp. 2d 598 (S.D.N.Y. 2012) ................................................................. 5

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ........................................................................... 23

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993) ............................................................................................ 35

*Starr v. Sony BMG Music* Entm't,
  592 F.3d 314 (2d Cir. 2010) ............................................................................... 25

*State v. Acordia, Inc.*,
  310 Conn. 1, 73 A.3d 711 (2013) ....................................................................... 40

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
  646 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................................ 18

*Subsolutions, Inc. v. Doctor's Associates, Inc.*,
  62 F. Supp. 2d 616 (D. Conn. 1999) .................................................................. 34

*Syncsort Inc. v. Sequential Software, Inc.*,
  50 F. Supp. 2d 318 (D.N.J. 1999) ................................................................ 23, 25

*Telebrands Corp. v. Del Labs., Inc.*,
  719 F. Supp. 2d 283 (S.D.N.Y. 2010) ................................................................ 10

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010) ................................................................................... 6

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) .................................................................... 17, 18, 21

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) .......................................................................... 25, 27

*Transclean Corp. v. Bridgewood Servs.*,
  77 F. Supp. 2d 1045 (D. Minn. 1999), *aff'd in part and vacated in part on other
  grounds*, 290 F.3d 1364 (Fed. Cir. 2002) .......................................................... 24

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
  783 F. Supp. 207 (S.D.N.Y. 1992) ..................................................................... 12

*Trex Co. v. CPG Int'l LLC*,
  Civil Action No. 5:17-cv-00005, 2017 U.S. Dist. LEXIS 120317 (W.D. Va. 2017) ....... 23

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
  679 F. Supp. 2d 1120 (C.D. Cal. 2009) .............................................................. 24

*U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester Cty.*,
  712 F.3d 761 (2d Cir. 2013) ............................................................................... 12

*U.S. v. Aetna Inc.*,
    240 F. Supp. 3d 1 (D.D.C. 2017) .......................................................................... 26, 28

*U.S. v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016) ....................................................................................... 27

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................................ 35, 37

*U.S. v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................... 26, 28

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................ 34, 36

*U.S. v. Visa U.S.A. Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001) ....................................................................... 28

*United States ex rel. Smith v. Yale Univ.*,
    415 F. Supp. 2d 58 (D. Conn. 2006) ......................................................................... 29

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*,
    2012 U.S. Dist. LEXIS 110974, 2012 WL 3240442 (S.D.N.Y. Aug. 7, 2012) ............... 13

*Victorinox AG v. B&F Sys.*,
    2017 U.S. Dist. LEXIS 214076 (S.D.N.Y. 2017) ....................................................... 13

*Villager Pond, Inc. v. Town of Darien*,
    56 F.3d 375 (2d Cir. 1995) ........................................................................................... 5

*W.L. Gore & Assocs., Inc. v. Totes Inc.*,
    788 F. Supp. 800 (D. Del. 1992) ............................................................................... 23

*Wacker v. JP Morgan Chase & Co.*,
    678 F. App'x 27 (2d Cir. 2017) ............................................................................. 4, 25

*Williams Ford, Inc. v. Hartford Courant Co.*,
    232 Conn. 559, 657 A.2d 212 (1995) ......................................................................... 39

*Zulick v. Patrons Mutual Ins. Co.*,
    287 Conn. 367, 949 A.2d 1084 (Conn. 2008) ............................................................ 39

**Statutes**

15 U.S.C. § 1127 ................................................................................................................ 16

**Other Authorities**

2 Areeda, Hovenkamp, & Blair, Antitrust Law ¶ 348 (2d ed. 2002) ......................................... 31

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 2, 4

Fed. R. Civ. P. 9(b) ............................................................................................................. 4

Fed. R. Evid. 201(b)(2) ................................................................................................. 10, 15

## I.   __INTRODUCTION__

Plaintiff (in the consolidated suit) TSI Products, Inc. ("TSI" or "Plaintiff") files this Opposition to The Armor All Defendants'[1] Motion to Dismiss the Second Amended Complaint Filed in Civil Action No. 3:17-CV-01131[2] (Dkt. 102).

This is a consolidated lawsuit[3] between competitors that sell do-it-yourself auto air conditioning ("AC") recharge products. In Consolidated Plaintiff TSI Products, Inc.'s Second Amended Complaint (Dkt. 96) ("Second AC"), TSI brings the following claims:

   (A) Lanham Act claims for trademark infringement and unfair competition based on Defendants' use of TSI's AVALANCHE and AC AVALANCHE word marks in search engine advertising and their use of TSI's unregistered AVALANCHE mountain logo in connection with their ARCTIC FREEZE products (Counts 1 and 2);

   (B) Lanham Act false advertising based on Defendants' misrepresentations and misleading claims regarding (a) their low-pressure-measuring-gauge recharge kits, which can cause extensive damage to ACT systems cars with BLOCK or TXV valves by leading to overcharging (the "Low-Pressure-Measuring Gauge Recharge Kit Claims."); and (b) their value-added A/C PRO refrigerants, which contrary to Defendants' representations, do not produce air colder than refrigerant products containing only R-134-A and no additives (the "Coldest Air Claims") (Count 3);

   (C) Restraint of trade, monopolization and monopolistic scheme, and attempted monopolization under the Sherman Act based on Defendants' agreements with retailers to restrain TSI from fairly competing in the market and thereby maintain a monopoly through restrictive and exclusionary conduct and an anticompetitive scheme (Counts 4, 5, and 6);

   (D) Unfair competition and unfair and deceptive acts and practices under the Connecticut Unfair Trade Practices Act ("CUTPA") based on the same misconduct

---

[1] "Armor All Defendants" or "Defendants" shall collectively refer to Defendants the Armor All/STP Products Company ("AA/STP"), Spectrum Brand Holdings, Inc. ("Spectrum"), Guy Andrysick ("Andrysick"), and Robert DeRidder ("DeRidder"), all of whom are movants seeking 12(b)(6) dismissal on pleadings.

[2] The title of Defendants' Motion cites Civil Action No. 3:17-CV-01131. However, the subject of the Motion is TSI's live pleading from consolidated action, No. 3:18-CV-01682-MPS.

[3] For a discussion of the procedural history, see Consolidated Plaintiff TSI Products, Inc.'s Opposition to The Armor All Defendants' Partial Motion to Strike the Second, Third and Seventh Counts of TSI Products, Inc.'s Second Amended Complaint filed contemporaneously herewith and fully incorporated herein by reference.

supporting TSI's Lanham Act and Sherman Act claims set forth in Counts 1 through 6, (Count 7).

Pursuant to Rule 12(b)(6), Defendants move to dismiss all of TSI's claims, presenting several arguments that are not proper at the pleading stage. While some written discovery has been exchanged, document production has not yet occurred and no depositions have been taken.

Each of the Defendants' arguments for dismissal should be rejected as follows:

1.  *Search Engine Advertising.* Defendants move to dismiss TSI's claims based on their use of TSI's AVALANCHE trademark in search engine advertisements. Contrary to Defendants' contentions, TSI has alleged more than the mere purchase of its wordmark as a keyword and sufficient facts to support likelihood of confusion, fact intensive issue. The header of the advertisement hyphenates TSI's AVALANCHE mark with Defendants' AC PRO mark (i.e. "AC Avalanche - A/C PRO"), Defendants do not distinguish between the brands in any way, and the advertisement is likely to cause consumer confusion as to source, sponsorship, affiliation, or connection.

2.  *AVALANCHE Mountain Logo.* Defendants challenge the plausibility of TSI's allegations of ownership of the unregistered AVALANCHE mountain logo based on (a) an unreasonable reading of the Trademark Assignment Agreement ("Assignment")[4] which would exclude the AVALANCHE mountain logo from its scope and (b) their disputed contentions regarding who first used of the mountain logos. Defendants' arguments fail because:

    a.  Defendants' interpretation of the Assignment contradicts the plain meaning of its terms, would create an ambiguity where otherwise there would be none, and is unreasonable and would frustrate the apparent business purposes of the contract.

    b.  Even if the Defendants' interpretation were considered reasonable, it would create ambiguity which must be interpreted in TSI's favor at the pleading stage. Dismissal on the pleadings based on an ambiguous contract is inappropriate, as extrinsic evidence should be considered to determine intent.

    c.  Defendants' contrary and vague allegations in AA/STP's First Amended Complaint (Dkt. 9) regarding first use of the mountain imagery and their belated and self-serving assertions in their copyright applications do not indisputably establish that they are the senior user. At this stage, TSI's

---

[4] *See* Defs.' Mem. at Ex. 2, Trademark Assignment Agreement (Dkt. 102-2).

plausible allegations regarding first use must be accepted as true and this disputed fact issue resolved after discovery has been completed.

3.   *False Advertising.* Contrary to Defendants' contentions, their false advertising claims are not mere puffery. The Low-Pressure-Measuring Gauge Recharge Kit Claims praising the salutary effects and all-in-one solutions provided by products which lead to overcharged AC systems and require additional tools to properly refill the refrigerant in cars with BLOCK and TXV valves are objectively false and misleading or false by necessary implication. The Coldest Air Claims are actionable are specific, factual assertions about a measurable characteristic (i.e. temperature) that may be proven true or false, a fact bolstered by Defendants' own claims to testing.

4.   *Antitrust Market Definition.* In support of its antitrust claims, TSI has sufficiently defined the market as value-added automotive AC recharge kits. Contrary to Defendants' contentions, TSI has pled that the non-value refrigerant products identified by Defendants are not reasonably interchangeable.

5.   *Antitrust Injury.* TSI sufficiently pleads facts to support the claim that Defendants' anticompetitive behavior has demonstrably harmed both TSI and competition generally in the relevant product market. Defendants decreased their wholesale pricing in 2015 after TSI entered the relevant market. After securing agreements to keep TSI off the shelves, the Defendants increased their prices to pre-TSI-competition levels. Consumers have been denied access to TSI's superior products, which include its "Smart Clip" technology, and have faced higher prices as a consequence of Defendants' anticompetitive conduct.

6.   *Unlawful Anticompetitive Conduct.* TSI has sufficiently pled facts that support each element of the Sherman Act Claims. Defendants attempts to add essential elements to TSI's antitrust claims that are not required by the law.

    a.   Conspiracy is not the exclusive ground on which to support a Sherman Act Section 1 claim. The alleged exclusive-dealing agreements constitute an unreasonable restraint of trade because they work to foreclose a substantial portion of the market to competition.

    b.   While TSI does not agree that Defendants' pricing is not predatory, an allegation of predatory pricing is not required to maintain a Section 1 claim.

    c.   TSI's claims of monopolization and attempted monopolization under Section 2 of the Sherman Act are supported by the allegation that Defendants' exclusive-dealing contracts have substantially foreclosed TSI's entry into the market and permitted Defendants to maintain their strangle-hold 88% market share. TSI has sufficiently pled that Armor All markets the products at the direction and control of Spectrum. Defendants

cite no law for the proposition that a Section 2 claim cannot be premised on a parent and its wholly-owned subsidiary.

7. *CUTPA*. Defendants challenge TSI's CUTPA claims, arguing that they have presented arguments sufficient to dismiss TSI's Lanham Act and Sherman Act claims and that therefore the CUTPA claims based on the same factual allegations should be dismissed. However, CUTPA has its own distinct jurisprudence and a plaintiff is not required to satisfy all elements of a Lanham Act or Sherman Act claim to maintain a claim under CUTPA. Defendants present no analysis of CUTPA's elements. Furthermore, as detailed herein, Defendants' challenges to TSI's Lanham Act and Sherman Act claims should be rejected.

## II.  <u>LEGAL STANDARDS</u>

 "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Neither Lanham Act nor Sherman Act claims have any sort of heightened pleading standard under Fed. R. Civ. P. 9(b). *See Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30-31 (2d Cir. 2017); *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 502 (D. Conn. 2009). A "plaintiff need only allege enough facts 'to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'" *Wacker,* 678 F. App'x at 29; *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (The *Iqbal- Twombly* standard "does not impose a probability requirement at the pleading stage.").

When considering a Rule 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). Factual disputes are "inappropriate for resolution on a motion to dismiss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d

Cir. 2015). "[T]he purpose of [Rule 12(b)(6)] 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011). The question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).

## III.   ARGUMENT

### A.   TSI Alleges Sufficient Facts to Support Claims Based on Keyword Advertising

TSI alleges Lanham Act infringement and unfair competition based on Defendants' use of "AVALANCHE" and "AC AVALANCHE" in their Google ad word search engine advertisement:



(*See generally* Dkt. 96, ¶¶ 135-153, 282-299). Defendants contend that these claims must be dismissed because TSI has only alleged the purchase of the trademark as a keyword, which is insufficient to demonstrate a likelihood of confusion under prevailing law. Contrary to Defendants' contention, TSI's Second AC pleads more than the mere purchase of the mark but alleges facts which support a finding of likelihood of confusion. Because a reasonable fact finder could find a

likelihood of confusion based on the alleged facts, dismissal is inappropriate. *See Scotch & Soda B.V. v. Scotch & Iron LLC*, No. 1:17-cv-04561 (ALC), 2018 U.S. Dist. LEXIS 82033, at *6, 2018 WL 2224997 (S.D.N.Y. May 15, 2018); *LBF Travel v. Fareportal, Inc.,* No. 13 Civ. 9143 (LAK) (GWG), 2014 U.S. Dist. LEXIS 156583, at *25 (S.D.N.Y. Nov. 5, 2014).

### 1.  Standards Regarding Infringement in Search Engine Advertising

To prevail on Lanham Act claims for trademark infringement and unfair competition, a plaintiff must show that the mark is entitled to protection[5] and that the defendant's use of the or a similar mark is likely to cause consumer confusion as to source, sponsorship, affiliation, or connection. *Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*, 823 F.3d 153, 160 (2d Cir. 2016); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010); *1-800 Contacts, Inc. v. Lens.Com, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013) ("Confusion need not be limited to the incorrect perception that one party was the source of the other party's product or service; it may also arise from 'a mistaken belief in common sponsorship or affiliation.'").

"[U]sing a keyword that includes a trademark to generate advertising through internet searches is actionable under the Lanham Act. . . . The [Second Circuit has] explained that the question of the likelihood of confusion turns on the particular circumstances surrounding the manner in which the allegedly infringing website is presented to the consumer." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 645 F. Supp. 2d 734, 761 (D. Minn. 2009) (citing *Rescuecome Corp. v. Google Inc.*, 562 F.3d 123, 130-31 (2d Cir. 2009)).

In keyword cases, "the crux of the issue is whether a defendant's keyword purchases, combined with the look and placement of that defendant's advertisement, create a search results

---

[5] Defendants do not challenge that the registered AVALANCHE mark is a distinctive and presumptively valid mark entitled to protection. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012); *Lane Capital Mgmt. v. Lane Capital Mgmt.*, 192 F.3d 337, 345 (2d Cir. 1999).

page which misleads, confuses or misdirects a consumer searching for a trademarked brand to the website of a competitor in a manner in which the source of the products offered for sale by the competitor is unclear." *Edible Arrangements LLC v. Provide Commerce, Inc.*, No. 3:14-CV-00250 (VLB), 2016 U.S. Dist. LEXIS 99291, at *31 (D. Conn. 2016).

"The Second Circuit . . . has not adopted an explicit test for determining whether a likelihood of confusion exists from a defendant's purchase of a trademark as a keyword term." *Edible Arrangements LLC*, 2016 U.S. Dist. LEXIS 99291, at *31.

> Prior courts have been primarily concerned with keyword bidding in conjunction with advertising that creates a search results page that is misleading to the consumer. In considering the question of whether such conduct violates the Lanham Act, several *Polaroid* factors can be helpful when viewed from the perspective of a user of the internet search engine at issue (the "user"), in particular: (i) the strength of the plaintiff's mark as a unique search term related to a distinct line of products, and (ii) the similarity of the marks and whether the defendant's mark draws a clear distinction as a competing brand. One additional factor described by the Ninth Circuit in *Network Automation* can also be helpful: (iii) what the consumer saw on the screen and reasonably believed, given the context.

*Id.* at *34 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011).

### 2.      TSI Sufficiently Alleges a Likelihood of Confusion

"A motion to dismiss will be granted for failure to plead likelihood of confusion only if 'no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove.'" *Scotch & Soda B.V.*, 2018 U.S. Dist. LEXIS 82033, at *6; *see also Rescuecom Corp.*, 562 F.3d at 131 ("Whether Google's actual practice is in fact benign or confusing is not for us to judge at this time. We consider at the 12(b)(6) stage only what is alleged in the Complaint.").

Defendants' purchase of "AC AVALANCHE" as a keyword reflects its distinctiveness as a mark for do-it-yourself AC refrigerant products. *See Gen. Steel Domestic Sales v. Chumley*, Civil

Action No. 10-cv-01398-PAB-KLM, 2013 U.S. Dist. LEXIS 64932, at *22 (D. Colo. 2013) (awareness of mark corroborated by use in defendant's AdWords advertisements).

Consideration of the three *Edible Arrangements LLC* factors supports the conclusion that the Defendants' search engine advertisement bearing "AC AVALANCHE – AC PRO" in the header is likely to cause consumer confusion as to affiliation, connection, sponsorship, and source.

TSI alleges that the use of the hyphenated phrase "AC Avalanche - A/C PRO" in the headline of the search engine advertisement falsely suggests an affiliation between TSI's AVALANCHE brand and the Defendants' A/C PRO brand and is likely to cause consumer confusion as to source, sponsorship, affiliation, or connection. (*See* Dkt.96, ¶¶ 143, 147, 148, 150).

Unlike Defendants' "AC Avalanche - A/C PRO" advertisement, search engine "[a]dvertisements [which] draw a contrast with the searched-for product and offer their own as an alternative . . . do not implicate the Lanham Act because they draw a _clear distinction_ between the products and do not imply the trademark holder's sponsorship or approval." *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.,* No. 10 Civ. 3314 (RWS), 2015 U.S. Dist. LEXIS 84172, at *16-17, 2015 WL 4033019 (S.D.N.Y. Jun. 26, 2015) (emphasis added); *see also Network Automation, Inc.,* 638 F.3d at 1149 (The advertisement "does not clearly identify the source of its product."); *Goldline, LLC v. Regal Assets, LLC*, No. CV 14-03680 DDP (ASx), 2015 U.S. Dist. LEXIS 52417, at *7, 2015 WL 1809301 (C.D. Cal. Apr. 21, 2015).

Defendants draw no distinctions between their AC PRO brand and TSI's AVALANCHE brand, either in the advertisement itself or the linked website. (Dkt. 96, ¶ 152). The advertisement linked customers searching for AVALANCHE products to Defendants' website, featuring an AC PRO recharge kit with a low-pressure-measuring gauge (for which there is a significant risk of overcharging) without any explanation or indication that the product was not associated with, or

approved by, or from the same source as AVALANCHE products. (Dkt ¶¶ 144-146). TSI alleges that the use of the AVALANCHE mark in this search engine advertising diverts TSI's customers by exploiting and tarnishing the goodwill of the AVALANCHE brand by misleading consumers into thinking that Defendants' products are produced by TSI or that there is a connection, affiliation, or sponsorship between Defendants and TSI. (Dkt. 96, ¶¶ 147-150).

TSI has properly alleged facts which could support a finding of a likelihood of confusion (Dkt. 96, ¶¶ 139-152), and therefore, the motion to dismiss should be denied with respect to claims based on the search engine advertisement. *Edible Arrangements LLC*, 2016 U.S. Dist. LEXIS 99291, at *36-37 ("A jury could find that the purpose and effect of Provide's keyword bidding — in conjunction with its use of EA's mark in its advertisement on the search results page — was to mislead consumers as to sponsorship or affiliation with EA and to misdirect the web traffic of users searching for EA's mark.").

### B.    TSI has Sufficiently Pled Ownership and First Use of the Mountain Logos

TSI asserts trademark rights and ownership in the following unregistered mountain logos used in connection with its AVALANCHE products (the "AVALANCHE Mountain Logo"):

 

(Dkt 96, ¶¶ 37-54, 293). TSI brings Lanham Act claims for unfair competition based in part on Defendants' infringement of AVALANCHE Mountain Logo in connection with their ARCTIC FREEZE products. (Dkt 96, ¶¶ 154-172, 291-299). Defendants challenge the plausibility of TSI's allegations of ownership of the AVALANCHE Mountain Logo based on (A) an interpretation of

the Trademark Assignment Agreement that contradicts the plain meaning it terms; and (B) the disputed fact issue of who used the mountain imagery first.

At this stage, the Court must accept as true TSI's allegations of ownership over the AVALANCHE Mountain Logo (Dkt. 96, ¶¶ 37, 40, 43-44, 46-51, 154, 292-293); *Fin. Guar. Ins. Co.*, 783 F.3d at 405; *Nielsen*, 746 F.3d at 62. TSI's trademark rights in the AVALANCHE Mountain Logo are not exclusively dependent on the Assignment. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (reliance is "a necessary prerequisite to the court's consideration of [such] document on a dismissal motion."). TSI's ownership of the rights in the asserted unregistered mark has been alleged and that should be the end of the inquiry at this stage. Further, if the court takes judicial notice of the document, it does so for its existence, "but not for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Glob. Network Communs., Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2006) (quoting *Kramer v. Time Warner*, 937 F.2d 767,774 (2d Cir. 1991)). The Court may recognize the existence of the document, but it should not be interpreted at this stage of the case. The cases relied upon by Defendants are inapposite because the courts only considered items extrinsic to the pleadings regarding "facts not subject to reasonable dispute . . . from sources whose accuracy cannot reasonably be questioned."[6] Fed. R. Evid. 201(b)(2). However, even if the court considers the language of the assignment, ownership of the marks by TSI is clear.

Defendants' arguments should be rejected because:

---

[6] *Bailey v. Interbay Funding LLC*, No. 3:17-CV-1457, 2018 WL 1660553, at * 8, 18-21, (D. Conn. Apr. 4, 2018) (considering state court orders in assessing res judicata and *Rooker-Feldman* challenges); *Telebrands Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 287 (S.D.N.Y. 2010) (taking judicial notice of patent filings listing plaintiff's licensor as owner); *Island Software & Comput. Serv. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (in response to parties' authenticity challenge, court entitled to take judicial notice of registrations as published in the Copyright Office's registry on summary judgment).

1) The arguments are inappropriate for a 12(b)(6) motion because they are based on disputed facts that should be resolved in TSI's favor at the pleading stage.

2) Defendants' construction of the Assignment should be rejected as it (a) contradicts the plain meaning of the language, e.g. the express inclusion of "trade dress" in the definition of "Marks"; (b) creates an ambiguity where there would otherwise be none; and (c) would frustrate the apparent business purpose of contract.

3) Any ambiguity should be resolved in TSI's favor and dismissal denied to permit discovery and consideration of relevant evidence of the parties' intent.

4) The scope of the Assignment is not determinative as to TSI's rights in the AVALANCHE Mountain Logo because this is an unregistered mark used first by TSI.

5) TSI's plausible allegations regarding first use must be accepted as true at this stage and this disputed fact issue resolved after discovery has been completed. Defendants' contrary and vague allegations in its complaint and their belated self-serving assertions in their copyright applications do not indisputably establish that they are the senior user.

### 1.   The Assignment Encompassed the AVALANCHE Mountain Logo

The Section II (1.1) transfer of the Assignment encompassed the AVALANCHE Mountain Logo because the trade dress associated with the AVALANCHE products is encompassed within the definition of "Marks" and the logo constitutes such trade dress. Defendants' construction of the Assignment ignores the inclusion of "trade dress" in the definition of "Marks" and would imply unwritten exclusions and limitations. The Defendants' interpretation is contrary to the plain meaning of the terms used, creates an inconsistency instead of harmonizing the provisions, and would frustrate the business purposes and manifest intent of the parties to transfer all rights, titles, and interest to TSI. Therefore, it should be rejected.

"Words and phrases in a contract should be given their plain meaning." *Bruce Kirby, Inc. v. LaserPerformance Ltd.*, No. 3:13-cv-00297 (JAM), 2016 U.S. Dist. LEXIS 106839, at *7 (D. Conn. Aug. 12, 2016).

"[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010).

No provision should be considered in isolation, the language should be examined in light of the business purposes sought to be achieved by the parties, and unreasonable interpretations which would frustrate the apparent business purposes of the contract should be rejected. *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y. v. Westchester Cty.*, 712 F.3d 761, 767 (2d Cir. 2013); *Horowitz v. Am. Int'l Grp., Inc.,* 498 F. App'x 51, 53 (2d Cir. 2012); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 783 F. Supp. 207, 210 (S.D.N.Y. 1992).

"The entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Morse/Diesel, Inc. v. Trinity Indus.*, 67 F.3d 435, 439 (2d Cir. 1995).

In relevant parts, Section II (1.2) of the Assignment reads as follows:

> . . . ASSIGNOR, hereby conveys . . . to ASSIGNEE . . . all of ASSIGNOR'S worldwide right, title, and interest in and to the Marks together with (1) the goodwill of the business related to the Products/Services in respect upon with the Marks are used, or in conjunction with which the Marks are used, and for which they are registered or for which registration applications have been filed; (2) all income, royalties, and damages hereafter due or payable to ASSIGNOR with respect to the Marks, including without limitation, damages, and payments for past or future unfair competition and/or infringement/dilution/misappropriation relating to the Marks; and (3) all rights to sue for past, present and future unfair competition and/or infringement/dilution/misappropriation relating to the Marks.

(Dkt. 102-2).

Section I (A) of the Assignment defines "Marks" as "the trademarks and *any and all trade dress associated therewith* as described on Exhibit A…." and "Products/Services" as "the goods and services on which, or in conjunction with which, the Marks are used." (Dkt. 102-2). Exhibit A lists the AVALANCHE wordmark and thus the term "Marks" includes all trade dress associated

12

with the AVALANCHE wordmark (Dkt.102-2). The AVALANCHE Mountain Logo was used on the same Products/Services with which the AVALANCHE wordmark was used.

The AVALANCHE Mountain Logo constitutes trade dress and is therefore encompassed within the definition of "Marks." The Second Circuit has "defined trade dress as 'the total image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics.'" *Bridge Metal Indus., LLC v. Travelers Indem. Co.*, 559 F. App'x 15, 18 (2d Cir. 2014) (citing cases). As depicted above, the AVALANCHE Mountain Logo, is "blue and white and features a stylized 'A' in the shape of a mountain and stylized mountain imagery that appears behind the brand name." (Dkt 96, ¶ 37). Its shape, color, and graphics constitute an element of the design and trade dress associated with the AVALANCHE wordmark and the products and services associated therewith. *See e.g. Victorinox AG v. B&F Sys.,* 2017 U.S. Dist. LEXIS 214076, at *6 n.1 (S.D.N.Y. 2017) (logo held to be element of trade dress); *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.,* 2012 U.S. Dist. LEXIS 110974, at *13, 2012 WL 3240442 (S.D.N.Y. Aug. 7, 2012) (same). Thus, the rights assigned in Section II (1.1) encompassed all worldwide rights, title, and interest in and to the AVALANCHE Mountain Logo which Michael Quest may have held, including all goodwill associated therewith and all rights to sue for unfair competition.

Defendants further argue that Section II (1.2) is insufficient to confer rights to sue and the goodwill associated with the AVALANCHE Mountain Logo. Section II (1.2) encompasses "*all rights* in the trade dress, labels, and designs associated with the Marks." Although the transfer of Section II (1.1) encompasses the AVALANCHE Mountain Logo, there is no basis in the plain language of Section II (1.2) for Defendants' narrow interpretation and implied exclusions.

## 2.   Any Ambiguity Should be Interpreted in TSI's Favor and the Motion Denied to Permit Discovery

If and to the extent the Court finds Defendants' interpretation reasonable and the contract thus ambiguous, the Motion should nonetheless be denied because contractual ambiguity must be resolved in TSI's favor.[7] *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 86 (2d Cir. 2015)( "On a motion to dismiss a breach of contract claim, '[the court] should resolve any contractual ambiguities in favor of the plaintiff.'"); *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, 2003 U.S. Dist. LEXIS 17498, at *3 (S.D.N.Y. 2003).

Further, dismissal on the pleadings based on one party's interpretation of an ambiguous contract is inappropriate; discovery should be completed and extrinsic evidence considered to resolve the ambiguity. *See Luitpold Pharm., Inc.*, 784 F.3d at 86 (reversing 12(b)(6) dismissal based on interpretation of ambiguous trademark license); *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012) ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered . . . and in the context of a motion to dismiss, . . . a court has insufficient data to dismiss a complaint for failure to state claim") (internal citations omitted).[8]

---

[7] As detailed herein, TSI's position is that the contract unambiguously coveys to TSI any and all rights, title, and interest previously held by Michael Quest in the AVALANCHE Mountain Logo, including goodwill and the rights to sue. Further, the interpretation offered by Defendants is unreasonable and contrary to the plain meaning of the language used and therefore does not create an ambiguity. *See Law Debenture Tr. Co.*, 595 F.3d at 467 ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain the contract language beyond its reasonable and ordinary meaning.'"); *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (same); *Great Minds v. FedEx Office & Print Servs.*, 886 F.3d 91, 94 (2d Cir. 2018)(When a contract is susceptible to two or more reasonable interpretations, it is ambiguous); *Nymbus, Inc. v. Sharp*, No. 3:17-cv-01113 (JAM), 2018 U.S. Dist. LEXIS 18302, at *7, 2018 WL 705003 (D. Conn. Feb. 5, 2018) ("A contract is ambiguous if it is 'subject to two or more reasonable interpretations after applying the pertinent construction principles.'").

[8] *See also Nat'l Loan Inv'rs, L.P. v. FDIC*, 53 F. App'x 146, 147 n.2 (2d Cir. 2002) (The Second Circuity Court of Appeals is "[o]rdinarily . . . reluctant to sustain a 12(b)(6) dismissal on the basis of a contract interpretation."); *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 426 (2d Cir. 1992); *FLLI Moretti Cereali S.p.A. v. Cont'l Grain Co.*, 563 F.2d 563, 566 (2d Cir. 1977); *One Source Envtl., LLC v. M + W Zander, Inc.*, 13 F. Supp. 3d 350, 361 (D.

This is particularly appropriate in this case, as Defendants rely solely on the Assignment filed with the USPTO in connection with TSI's registered wordmarks (including the AVALANCHE (Reg. 4,823,588)). The AVALANCHE Mountain Logo is an unregistered mark, not subject to the requirements of filing of written assignments with the USPTO. There are additional documents and other information that has yet to be exchanged in discovery regarding the AVALANCHE Mountain Logo. No documents have as yet been exchanged and no depositions taken. Such additional evidence is not properly presented on a 12(b) motion on the pleadings.

### 3.     TSI Plausibly Alleges Ownership Through Prior Use

"A plaintiff alleges ownership over an unregistered trademark through asserting that he made prior use of the trademark. This means that the plaintiff claims to have made the first use of the mark to identify his goods or service and continues to use the mark commercially." *Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 573 (S.D.N.Y. 2013).

There is nothing implausible about TSI's allegations that Defendants did not use the mountain imagery until 2017, well after TSI made its first commercial use of the AVALANCHE Mountain Logo in 2015. TSI allegations compare the ARCTIC FREEZE products as sold prior to 2017, without the mountain imagery, and after 2017, with the mountain imagery. (Dkt 96, ¶¶ 158-160). Citing to AA/STP's allegations in its First Amended Complaint (Dkt. 9) and its belated copyright application,[9] Defendants challenge the plausibility of TSI's allegations that Defendants

---

Vt. 2014); *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 (KAM), 2012 U.S. Dist. LEXIS 174295, at *54 (E.D.N.Y. 2012).

[9] While the Court may take judicial notice of the pleadings in this case, AA/STP's disputed allegations cannot be presumed. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Furthermore, neither AA/STP's First Amended Complaint (ECF No. 9) nor its belated copyright application establish as a matter of law that AA/STP used the mountain logo in commerce in 2014 or any time prior to TSI's use in 2015. Indeed, AA/STP's First Amended Complaint suggest that the mountain logo was not used on

did not begin using the mountain imagery in commerce until 2017. However, that Defendants deny

the allegation does not render TSI's allegation implausible. It's simply a disputed fact issue not

properly resolved on the pleadings. *See Anthem Sports, LLC v. Under the Weather, LLC*, 320 F.

Supp. 3d 399, 417 (D. Conn. 2018) ("[L]ike all fact-intensive inquiries, the empirical intricacies

of whether Anthem used its "SportPod™" in a sufficiently public manner are best left for a later

stage of the case."); *Sik Gaek, Inc. v. Yogi's II, Inc.*, No. CV-10-4077 (ARR) (VVP), 2013 U.S.

Dist. LEXIS 78557, at *4 (E.D.N.Y. Feb. 28, 2013) ("[T]he court cannot resolve the disputed

issues of fact as to whether the plaintiff owns or has a legally cognizable interest in the mark. . . .

Accordingly, the motion to dismiss should be denied.").[10]

## C.   Defendants' False Advertising Claims are Not Mere Puffery

---

ARCTIC FREEZE products until 2016: "[AA/STP] began distributing ARCTIC FREEZE products having the redesigned label [with mountain imagery] no later than early 2016." (Dkt. 9, ¶ 32).

With respect to 2014, AA/STP's alleges that it had "commenced development of new artwork and logos for the ARCTIC FREEZE product line which incorporate additional snow covered mountain marks…" in 2014, a "redesign project [which] required a substantial investment of [AA/STP's] time." (Dkt. 9, ¶ 30). With respect to actual use in commerce in 2014, AA/STP only vaguely alleges that "marketing materials for ARCTIC FREEZE kits and refill products featuring snow covered mountain logos . . . were shown to refrigerant retailers during spring 2014, and used in consumer test surveys that same year." (Dkt. 9, ¶ 31). No depiction of the alleged 2014 marketing materials is provided. Instead, AA/STP asserts only that the mountain logos used on said materials were similar to apparently discarded designs allegedly developed in May 2014. (Dkt. 9, ¶¶ 31-32).

The vaguely alleged 2014 distribution of "marketing materials" to unidentified retailers and consumer test surveys does not likely constitute "use 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *ComPsych Corp. v. Health Champion LLC*, No. 3:12 cv 692(VLB), 2012 U.S. Dist. LEXIS 176580, at *22-23, 2012 WL 6212653 (D. Conn. Dec. 13, 2012); *Elastic Wonder, Inc. v. Posey*, No. 13 Cv. 5603 (JGK), 2015 U.S. Dist. LEXIS 7366, at *7 n.2, 2015 WL 273691 (S.D.N.Y. Jan. 22, 2015); *Dual Groupe, LLC*, 932 F. Supp. 2d at 573; *see also* 15 U.S.C.S. § 1127 (defining "use in commerce"). Pre-sale "use of the mark must penetrate a significant portion of the relevant market. . . . [P]urchaser perception must involve more than an insubstantial number of potential customers. For example, if the potential market for a given service were 10,000 persons, then advertising shown to have reached only 20 or 30 people as a matter of law could not suffice." *ComPsych Corp.*, 2012 U.S. Dist. LEXIS 176580, at *22-23.

[10] *See also Bluewater Key RV Ownership Park Prop. Owners Ass'n v. Clark*, No. 15-10060-CIV-GOODMAN, 2016 U.S. Dist. LEXIS 123138, at *20, 2016 WL 4761853 (S.D. Fla. Sept. 12, 2016) ("Reliance of the USPTO certificate of registration, the letter, and the trademark name search results may in fact create issues of fact as to whether Plaintiff first used the Bluewater Key trademarks in 1989. . . . Nonetheless, at this stage, Plaintiff has sufficiently alleged facts, which this Court accepts as true, to state a cause of action for trademark infringement and unfair competition. Defendant will still have the opportunity to seek to disprove those allegations.").

Defendants challenge TSI's Section 43 false advertising claims arguing that the false statements are merely non-actionable puffery and subjective statements of opinions. To the contrary, both the Coldest Air Claims and the Low-Pressure-Measuring Gauge Recharge Kit Claims are objectively false and misleading or false by necessary implication.

<b>1.      Second Circuit Law on Puffery</b>

To establish a Section 43 claim "the plaintiff must demonstrate that the message in the challenged advertisement is false. Falsity may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995).

The Second Circuit has recognized two forms of puffery: (1) "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion;" and (2) "an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007) (quoting *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000)).

The Second Circuit "has had little occasion to explore the concept of puffery in the false advertising context." *Id.* at 159. However, in *Avola v. La.-Pacific Corp.*, a Second Circuit district court discerned three factors from the case law that form a workable test for puffery: (i) vagueness; (ii) subjectivity; and (iii) inability to influence the buyers' expectations." 991 F. Supp. 2d 381, 392-94 (E.D.N.Y. 2013). (collecting cases). "The 'vagueness' factor applies when the disputed statements fail to describe a specific characteristic of the product on which the claims are based." *Id.* at 393 (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)). "The 'subjectivity' factor applies when the disputed statements may not be measured on an objective basis, such as by reference to clinical studies or comparison with the product's competitors."

*Avola*, 991 F. Supp. 2d at 393 (citing *Lipton,* 71 F.3d at 474); *see also Castrol*, 987 F.2d at 946 (holding statement "measurable by comparative research" and, "by implication, compare[d] [product's] effectiveness against engine wear to that of its competitors" was not puffery). Finally, "[t]he 'inability to influence' factor applies when, among other things, the disputed statements are made by all of the product's competitors, or these statements cannot mean everything that they suggest." *Avola*, 991 F. Supp. 2d at 393. For example, "a statement that a sports beverage will 'Upgrade your game' is plainly an exaggeration, because no buyer truly believes that consuming this beverage 'result[s] in improved athletic abilities." *Id.* at 394 (quoting *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 529-30 (S.D.N.Y. 2009)); *see also Avon Prods. v. S.C. Johnson & Son, Inc.*, 1994 U.S. Dist. LEXIS 7950, at *22-25 (S.D.N.Y. June 9, 1994).

"When determining whether a given statement is mere puffery, courts consider the context in which the statement was made." *Manier v. L'Oreal U.S.A., Inc. (In re Amla Litig.),* No. 16-cv-6593 (JSR), 2017 U.S. Dist. LEXIS 116139, at *26-28 (S.D.N.Y. July 17, 2017).

A claim can be actionable even if it "does not explicitly make a false assertion if the words or images, considered in context, necessarily and unambiguously imply a false message." *Time Warner Cable, Inc.*, 497 F.3d at 148.

> Under [the "false by necessary implication"] doctrine, a district court . . . must consider the advertisement in its entirety and not engage in disputatious dissection. . . . If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required. . . . However, only an unambiguous message can be literally false. . . . Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false. . . . There may still be a basis for a claim that the advertisement is misleading, but to resolve such a claim, the district court must look to consumer data to determine what the person to whom the advertisement is addressed finds to be the message. . . . In short, where the advertisement does not unambiguously make a claim, the court's reaction is at best not determinative and at worst irrelevant.

*Id.* at 158 (internal citations and quotations omitted).

18

## 2.   The Low-Pressure-Measuring Gauge Recharge Kit Claims

The Low-Pressure-Measuring Gauge Recharge Kit Claims consists of false and misleading statements that such products have the following characteristics, benefits, and features:

  a.   "Extend AC Life;"

  b.   "Protect [AC] system";

  c.   "Come with everything you need to recharge your system with no additional tools or equipment";

  d.   provide an "all-in-one solution";

  e.   permit one to recharge their system in "just three easy steps";

  f.   include gauges which provide for fast, easy, and/or convenient recharging;

  g.   include gauges which provide for accurate recharging;[11] and

  h.   "make filling your system to the proper level fast and easy."

In support of their motion to dismiss TSI's false advertising claims based on the Low-Pressure-Measuring Gauge Recharge Kit Claims, Defendants primarily rely upon their motion to strike (Dkt. 103) and only secondarily argue (in a rather conclusory fashion) that said claims are non-misleading statements of fact, subjective statements of opinion, or mere puffery that are not actionable under the Lanham Act. (Dkt 102 pp. 13-13). Defendants conveniently gloss over most of the statements and make the global argument that the references to "fast," "easy" or "convenient" steps are subjective claims about products, which cannot be proven either true or false. *Id.* Defendants assert that some of the statements — without identifying which — may be

---

[11] Defendants suggest that that have not made the statements described in (f) and (g), without expressly denying that they have made such representations. (Dkt. 102 p.15 n.5). However, such statements have indeed been made by Defendants as illustrated in numerous allegations in the Second AC. (Dkt. 96, ¶ 77 ("Easy as 1, 2, . . . Squeeze"), ¶¶ 79 and 81 ("fast and accurate recharging"), ¶ 82 ("fast and easy"), ¶ 83 ("fast, easy and accurate recharging"), ¶ 85 ("easy, convenient, and accurate recharging"), ¶ 86 (recharging is "a breeze with AC PRO" and "fast and easy"), ¶ 87 ("just three easy steps").

considered non-misleading statements of fact. Of course, it is impossible to respond to this argument because they fail to identify any specific statements.

Notwithstanding Defendants' vague arguments, the Low-Pressure-Measuring Gauge Recharge Kit Claims are provably literally false or are false by necessary implication and are therefore actionable statements. The deficiencies of the low-pressure-measuring-gauge recharge kits are pled clearly and in detail in the Second AC. (Dkt 96, ¶¶ 89-109, 301, 307). TSI has alleged that when used with the BLOCK and TXV valves, low-pressure-measuring gauges can provide unusable and inaccurate readings, leading consumers to damage their AC systems by overcharging. Further, TSI alleges that additional tools are required to properly refill such AC systems without overcharging. (Dkt. 96, ¶¶ 89-109). These deficiencies are objectively provable.

The Low-Pressure-Measuring Gauge Recharge Kit Claims are actionable because the falsity of these statements is objectively provable. It will be shown that these recharge kits do not extend the life of nor protect the AC systems of vehicles with BLOCK or TXV valves; they do not provide an "all-in-one solution" for such systems and do not contain everything that is needed to recharge such AC systems; and they do not provide, fast, easy, convenient or accurate recharging. (Dkt. 96, ¶¶ 89-109). To the contrary, it will be shown that these recharge kits products actually require additional equipment or tools to recharge such AC system accurately and safely. (Dkt. 96, ¶ 93). As a result, the statements state a cause of action under the Lanham Act and should not be dismissed. *See Castrol, Inc.*, 987 F.2d at 946 (holding claims that product "outperforms any leading motor oil against viscosity breakdown" and provide "longer engine life and better engine protection" were measurable and not mere puffery); *Avola v. La.-Pacific Corp.*, 991 F. Supp. 2d 381, 393-94 (E.D.N.Y. 2013) (holding claims that products "work and cut just like traditional wood, taking nails and screws with ease" was not mere puffery because they were "specific,

describing key characteristics of [the product]: its wood-like working quality and ability to take nails"; quantifiable, "in that [claims] equate [the product] with "traditional wood" siding products [and] specifically measure [the product's] ability to take nails based on this benchmark.").

Even if the Court were to find that the Low-Pressure-Measuring Gauge Recharge Kit Claims are not literally false, the statements are actionable because they are false by necessary implication. *See Time Warner Cable, Inc.*, 497 F.3d at 148. The statements unambiguously communicate that the kits extend the life of and protect AC systems and contain all tools necessary to easily, accurately, and conveniently recharge AC systems. However, for the reasons stated above and detailed in the Second AC, these representations are misleading and are false by necessary implication. *See Hall v. Bed Bath & Beyond, Inc.,* 705 F.3d 1357, 1367 (Fed. Cir. 2013) (reversing dismissal of false advertising claim and holding that defendants' description of a towel as having "performance that lasts the useful lifetime of the towel" implies that the product would not fall apart after a single wash or a few washes) ("A reasonable consumer would expect the 'useful lifetime' of a towel to be more than one or a few washes. . . . Here, 'lasts the useful lifetime of the towel' literally states that the towel lasts as long as it lasts, even if it lasts for only one washing."); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 588-589 (3d Cir. 2002) (holding that while "Night Time Strength" could mean whatever strength the product happened to have at night, the label was false by necessary implication because "the phrase 'nighttime strength' . . . necessarily conveys a message that the . . . product is specially made to work at night."); *Clorox Co. v. Proctor & Gamble Commer. Co.,* 228 F.3d 24, 35-36 (1st Cir. 2000) (finding that plaintiff had stated a claim that the "overall theme" of the advertisement was that bleach is unnecessary if clothes were washed with defendant's detergent).

3.      **The Coldest Air Claims are Measurable**

The Coldest Air Claims consists of the following false and misleading statements regarding Defendants' A/C Pro Professional Formula and A/C Pro Ultra Synthetic Formula refrigerants:

a.   Provide the "#1 Rated Coldest Air";

b.   Provide "#1 Coldest Air";

c.   have "2X cooling boosters";

d.   have been "independently tested to deliver the coldest air from your vehicle"; and

e.   help "a vehicle's A/C produce the coldest air."

As set forth in the Second AC, the foregoing claims are false in that additive-free refrigerants containing only R-134a provide the coldest air from an AC system and provide colder air than the A/C Pro Professional Formula and A/C Pro Ultra Synthetic Formula, which contain non-refrigerant additives. (Dkt. 96, ¶¶ 121-128). They do not produce the coldest air, do not have "2X cooling boosters" than other products containing R-134a, and no independent test has been conducted which would establish they deliver the coldest air.

Contrary to Defendants' contentions, the Coldest Air Claims are actionable because they are specific, factual assertions about a measurable characteristic (i.e. temperature) that may be proven true or false. Each statement meets the three relevant criteria noted in *Avola*: (1) they are specific and "apply to a characteristic of the product," namely, temperature; (2) are quantifiable and concern a readily measurable parameter, again temperature; and (3) they are not so clearly exaggerated that consumers can be expected to disregard them and thus have the ability to influence purchasing decisions.

Defendants cite inapposite case law for the contention that the "#1 Coldest Air" and "#1 Rated Coldest Air" are vague statements of superiority and therefore mere puffery. Firstly, the

"#1" modifiers do not alter the substantive misrepresentation that the air produced is the coldest. Secondly, as acknowledged by Defendants, "#1" statements will not be considered puffery when it is clear how the property is to be measured.[12]

"[S]tatements specifically addressing product attributes or statements which are measurable by comparative research are not considered puffing." *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 341(D.N.J. 1999); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("While product superiority claims that are vague or highly subjective often amount to nonactionable puffery, 'misdescriptions of specific or absolute characteristics of a product are actionable.'"); *Castrol, Inc.*, 987 F.2d at 946 ("Pennzoil's claim of engine protection by contrast involves more than a mere generality. Here, the claim is both specific and measurable by comparative research.").

Unlike the cases cited by Defendants,[13] here the property and manner of measurement is clear—the temperature of air produced—and there is no ambiguity regarding the Defendants' representation that the A/C PRO refrigerants produce the coldest air. *Cf. Castrol, Inc.*, 987 F.2d at 946 (holding claims that product "outperforms any leading motor oil against viscosity breakdown" and provide "longer engine life and better engine protection" were measurable and not mere puffery); *W.L. Gore & Assocs., Inc. v. Totes Inc.*, 788 F. Supp. 800, 809 (D. Del. 1992) (numerical

---

[12] Defs.' Mem. p. 12 ("[C]ourts have also recognized that '#1'statements qualify as puffery when it is unclear how a property should be measured.") (Dkt. 102).

[13] *Trex Co. v. CPG Int'l LLC*, Civil Action No. 5:17-cv-00005, 2017 U.S. Dist. LEXIS 120317, at *8 (W.D. Va. 2017) (holding "the #1 in Premium Decking" and "Number One in Premium Decking" to be puffery); *Bridal Expo, Inc. v. Van Florestein*, No. 4:08-cv-03777, 2009 U.S. Dist. LEXIS 7388, 2009 WL 255862 (S.D. Tex. Feb. 3, 2009) (holding that "Houston's #1 Bridal Show" constitutes puffery); *Home Show Tours, Inc. v. Quad City Virtual, Inc.*, 827 F. Supp. 2d 924, 937 (S.D. Iowa 2011) (holding "the #1 FSBO destination in the QCA" constitutes puffery); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 34-35 (E.D.N.Y. 2009) (holding "No. 1 Dr. Recommended Joint Care Brand" not actionable because subject to more than one reasonably interpretation); *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1209 (D. Kan. 2003) (holding dog food advertisement stating "Natural Choice - #1 in America's Pet Stores" not literally false because ambiguous).

comparison that product is seven times more breathable "gives the impression that the claim is based upon independent testing" and "is not a claim of general superiority or mere puffing"); *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1138 (C.D. Cal. 2009) (denying motion to dismiss claim that swimsuit gave swimmers 'a 2% advantage' because a specific and measurable advertisement claim of product superiority is actionable, even without a direct comparison to a competitor); *Transclean Corp. v. Bridgewood Servs.*, 77 F. Supp. 2d 1045, 1097-98 (D. Minn. 1999), *aff'd in part and vacated in part on other grounds*, 290 F.3d 1364 (Fed. Cir. 2002), ("Bridgewood's advertisement advances its general claim of product superiority with an attribution of a specific, relevant characteristic of its product, which is quantified in absolute, often numerical, terms. Bridgewood's representation, that its product replaces or exchanges '100%,' 'all,' or 'every drop' of a vehicle's used transmission fluid, are not puffery.").

"Where a plaintiff challenges a test-proven superiority advertisement, the defendant must identify the cited tests. Plaintiff must then prove that these tests did not establish the proposition for which they were cited." *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 63 (2d Cir. 1992). Defendants surprisingly argue that their claim that their product has been "independently tested to deliver the coldest air from your vehicle" and help "a vehicle's A/C produce the coldest air" is not provably true or false. (Dkt. 102, pp. 15-16). The position lacks credibility. Defendants need only produce the independent testing referenced in the statement. If Defendants cannot do so, they have proven their own statement false.

The Coldest Air Claims clearly represent that Defendants' products are the "coldest" products available, an attribute that can be proven with thermometer readings showing the statements to be true or false. Further, the statements can be shown to be false based upon the fact that the products include additives that reduce the effectiveness of pure refrigerant, a competitive

product. At the motion-to-dismiss stage, TSI is not required to win its case on the merits. With respect to the Coldest Air Claims, TSI has met its burden to plead a cause of action on which it would prevail if its allegations are proven true because the statements are provably false and therefore actionable. *See Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 342 (D.N.J. 1999) ("At the pleading stage, all that is required is that Sequential plead facts demonstrating the assertions of product superiority . . . rely on measurable, comparative test results.").

### D.   TSI's Antitrust Claims Under the Sherman Act Should Not be Dismissed

Defendants contend that TSI's antitrust claims (Claims 4-6) should be dismissed because (1) TSI's Second AC purportedly fails to define the relevant market, (2) TSI allegedly fails to plead an antitrust injury, and (3) TSI supposedly fails to properly plead conduct that would violate the antitrust laws. (Dkt. 102, p. 16). As set forth below, however, Defendants hold TSI to a higher pleading standard than the law requires and, in any event, the well-plead allegations of TSI's Second AC taken as true (as they must be at this stage) more than adequately satisfy the antitrust claim pleading requirements. For these reasons and as further set forth below, therefore, Defendants' Motion to Dismiss the antitrust claims should be denied.

### 1.   TSI Sufficiently Pled a Relevant Market

In the Second Circuit, it is axiomatic that "[b]ecause market definition is a deeply fact intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *See Wacker v. JP Morgan Chase & Co.*, 678 F. App'x 27, 30-31 (2d Cir. 2017) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001)). There is no heightened pleading standard in antitrust cases, but rather, a "plaintiff need only allege enough facts 'to raise a right to relief above the speculative level,' and 'state a claim to relief that is plausible on its face.'" *Id.* at 29 (quoting *Starr v. Sony BMG Music* Entm't, 592 F.3d 314, 321 (2d Cir. 2010)); *Concord Assocs., L.P. v. Entm't Properties Trust*, 817 F.3d 46, 52 (2d Cir. 2016).

25

One threshold requirement for all of the asserted antitrust claims is to plead a relevant product market. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *See Brown Shoe Co. v. U.S.*, 370 U.S. 294, 323 (1962). "[T]he mere fact that a [product] may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes." *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997). "This analytical approach guides antitrust courts in attempting to answer one 'key question': whether particular products 'are sufficiently close substitutes' such that substitution to one could 'constrain any anticompetitive . . . pricing' in the other. *U.S. v. Aetna Inc.*, 240 F. Supp. 3d 1, 20 (D.D.C. 2017) (quoting *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 54 (D.D.C. 2011)).

Here, TSI has sufficiently pled that the relevant market is the market for value-added automotive AC recharge kits.[14] TSI has pled a plausible relevant product market for which competition will be impaired due to Defendants' anticompetitive conduct, (Dkt. 96, ¶¶ 178-184), and that consumers of value-added automotive AC recharge kits do not view non-value added cans of bare R-134a refrigerant as reasonably interchangeable. (Dkt. 96, ¶¶ 184-189). Value-added automotive AC recharge kits include additives, as well as tools, gauges, or hoses, that are lacking in the non-added automotive AC recharge kit segment. (Dkt. 96, ¶ 181). These additives in particular distinguish value-added recharge kits from cans of bare refrigerant, as they allow "users to detect and mitigate the underlying causes of refrigerant loss in aging automotive AC systems,"

---

[14] TSI has pled that "value added" automotive AC recharge kits consist of "cans of R-134a refrigerant that also typically contain some combination of additives, lubricants, hoses, gauges, or other tools" (Dkt. 96, ¶ 181) while non-value added category consists mainly of "cans of R-134a refrigerant, without any included additives, tools, gauges, or hoses." *Id*. at ¶ 180.

whereas bare cans of R-134a refrigerant only allow users to add more refrigerant to their system. (Dkt. 96, ¶ 183). Thus, for antitrust purposes TSI has pled a distinct market for value added kits.

TSI's Second AC further pleads that non-value added refrigerant kits are not closely substitutable with the value-added kits, as evidenced at least by a significant difference in price between the two categories. (Dkt. 96, ¶¶ 185-189). Significant differences in price between two product categories has long been recognized as relevant evidence that the products are not close substitutes. *Brown Shoe Co.*, 370 U.S. 294.

Furthermore, the Second Circuit has often applied the Hypothetical Monopolist Test (HMT) to help define a relevant market. *U.S. v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016); *Todd*, 275 F.3d at 202. The test asks whether a hypothetical monopolist in the proposed relevant market could profitably impose a small but significant non-transitory increase in price ("SSNIP") for that product, or whether substitution to other reasonably interchangeable would make any attempted price increase unprofitable. *Id.* In this case, TSI has further pled that a SSNIP for value-added refrigerant kits in relation to non-value-added refrigerant kits actually occurred in 2018. (Dkt. 96, ¶¶ 185-189). Moreover, while the average price of value-added refrigerant kits significantly increased from early 2017 to early 2018, sales of value-added automotive AC recharge kits in 2018 also increased at the same time. (Dkt. 96, ¶ 187-189). The allegation that the SSNIP of the value-added kits lead to an increase in sales further supports that the non-value added products do not substantially constrain the pricing of value-added kits. Therefore, TSI has sufficiently pled that the relevant product market should not include the non-value added products.

Defendants hold TSI to an improperly high standard of pleading. For example, Defendants argue that TSI's Second AC fails to consider whether taking a vehicle to a mechanic to recharge an AC system is a close substitute to a value-added DIY refrigerant kit. This argument, however,

misses the mark. TSI need not plead the absence of every possible distant substitute; it merely needs to plausibly plead a relevant market. TSI has met this standard.

In any case, while a value-added DIY refrigerant kit provides a similar function to hiring a mechanic to recharge and repair an aging air conditioning system, "functional interchangeability" is not the standard. *Aetna Inc.*, 240 F. Supp. 3d at 20.

An analogous issue was addressed in *H&R Block*, where the defendant objected to the government's definition of the relevant market for DIY tax preparation software, such as TurboTax, because it did not include other methods of tax preparation such as pen-and-paper DIY tax preparation on one end of the spectrum and seeking the assistance of a licensed accountant on the other end. *See H&R Block*, 833 F. Supp. 2d at 55. While it is true that all of those products competed for the same general pool of consumers—all U.S. taxpayers—the court found that neither should be included in the relevant product market. *Id.* at 58; *see also FTC v. H.J. Heinz Co.,* 116 F. Supp. 2d 190, 195 (D.D.C. 2000), *rev'd on other grounds,* 246 F.3d 708 (D.C. Cir. 2001) (noting that homemade baby food and breast milk should not be included in the jarred baby food market even though substitution was possible because "the Supreme Court's interchangeability test refers to *products.*"); *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 41-42 (D.D.C. 2009) (excluding books that can be used to perform insurance loss valuations by hand from market for loss valuation software); *U.S. v. Visa U.S.A. Inc.,* 163 F. Supp. 2d 322, 338 (S.D.N.Y. 2001) (excluding cash and checks from general purpose credit card market). The *H&R Block* court further noted that the functional experience of using tax software "is meaningfully different from the self-service task of filling out forms independently. Manual completion of a tax return requires different tools, effort, resources, and time investment by a consumer than use of either" software or accountancy services. *Id.*

The same rationale applies here. Using a DIY kit to recharge one's own vehicle AC is "meaningfully different" from bringing one's car to an auto mechanic to perform the same service, which requires "different… effort, resources, and time investment by a consumer" than using a DIY kit at home. TSI has pled as much. (Dkt. 96, ¶ 176). Thus, TSI has sufficiently pled why value-added refrigerant kits constitute the relevant market.

Finally, the Defendants argue that TSI's proposed market only addresses shelf space in the physical retail market, and does not account for possible online sales. (Dkt. 102 at p. 18). However, nothing in the Second AC limits the proposed relevant product market to physical sales. (Dkt. 96, ¶¶ 178-184). Furthermore, Defendants argue that the websites of these physical retailers have not excluded TSI or other competing products on the basis of Defendants' anticompetitive agreements. (Dkt. 102 at p. 18). However, the Defendants cite screenshots of the AutoZone and Wal-Mart websites as "proof" of this argument. (Dkt. 102 at 18, Exhibit 4). Notwithstanding the inappropriateness of introducing alleged outside "evidence" for a motion to dismiss on the pleadings,[15] TSI's Second AC does not contain any allegations that AutoZone or Wal-Mart have entered into any sort of exclusionary agreement with the Defendants. Conversely, TSI's AC recharge products are not sold on the websites of retailers that have entered into the exclusionary agreements with the Defendants.

For at least these reasons, TSI has sufficiently pled a relevant product market for the purposes of the asserted Sherman Act claims.

---

[15] "Outside evidence…is not properly considered on a motion to dismiss." *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 94 n.20 (D. Conn. 2006); citing *Friedl v. City of N.Y.*, 210 F.3d 79, 83 (2d Cir. 2000).

## 2.   __TSI Sufficiently Pled an Antitrust Injury__

To establish antitrust standing, a plaintiff must allege that it suffered an antitrust injury. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). The Second Circuit uses a three step process to determine whether a plaintiff has sufficiently alleged an antitrust injury: (1) "identify the practice complained of and the reasons such a practice is or might be anticompetitive;" (2) "identify the actual injury the plaintiff alleges;" and (3), the court must consider how the "anticompetitive effect of the specific practice at issue" relates to "the actual injury the plaintiff alleges." *Id*.

TSI has alleged an antitrust injury. Specifically, TSI alleges that Defendants have used agreements with three of the largest six retailers in the relevant product market to prevent TSI from selling its competing product, substantially foreclosing TSI's access to this relevant product market. (Dkt. 96, ¶ 276). These six retailers control upwards of 80% of the relevant product market. (Dkt. 96, ¶ 200). Defendants are the single largest seller in this market, currently commanding an 88% market share. (Dkt. 96, ¶ 193). TSI is Defendants' largest competitor in this market, with a 10% market share. (Dkt. 96, ¶ 195). All other competitors combined only have a 2% share of the relevant market. (Dkt. 96, ¶ 196).

TSI's pleading reflects that Defendants' anticompetitive behavior has actually injured TSI and has harmed competition in the relevant product market. Defendants' agreements to exclude TSI from several large retailers have stifled competition and denied TSI sales that it otherwise would have made. (Dkt. 96, ¶¶ 218-234; 266-267). This harm to TSI has also harmed competition and consumers in the relevant product market. For example, TSI has pled that after it entered the market in 2015, Defendants faced competition which caused initially downward pricing pressure. However, once Defendants' anticompetitive behavior commenced in 2017, it was able to raise its prices back to pre-competition pricing. (Dkt. 96, ¶¶ 213-214). TSI has further pled that consumers

have faced diminished choices and higher prices as a consequence of Defendants' actions. (Dkt. 96, ¶¶ 274-278). As further alleged by TSI's Second AC, customers have been denied access to TSI's superior product, which includes its "Smart Clip" technology, which is more effective on most newer cars with BLOCK or TXV than AA/STP's products, which rely on gauges and are prone to overfilling in these vehicles. (Dkt. 96, ¶ 277).

Taken as true for the purposes of a motion to dismiss, each of the above consequences of Defendants' conduct, individually and collectively, constitutes an injury to competition sufficient to adequately plead an antitrust claim. For example, in *Fido's Fences, Inc. v. Radio Sys. Corp.*, 999 F. Supp. 2d 442 (E.D.N.Y. 2014), the plaintiff pled that defendants maintained their dominant market share by anticompetitive means, "including by requiring dealers to agree to exclusive dealing provisions." *Id*. at 451. The plaintiff further pled that:

> these practices have erected barriers to entry and stifled competition in the submarket for replacement batteries, allowing defendants to charge exorbitant markups and preventing competitors from selling lower priced alternatives. Specifically, Fido's claims that, although it offers batteries of identical quality at a fraction of the price of those sold by defendants, defendants' exclusionary practices have impeded its ability to compete for market share, resulting in economic harm to [plaintiff].

*Id*. at 452. Viewing these allegations as true for the purposes of a motion to dismiss, the court found that "[t]his type of market foreclosure is the kind of injury to competition that the antitrust laws were designed to prevent." *Id*., citing *In re DDA VP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 688 (2d. Cir. 2009); 2 Areeda, Hovenkamp, & Blair, Antitrust Law ¶ 348 (2d ed. 2002) ("[A] rival has clear standing to challenge the conduct of rival(s) that is illegal precisely because it tends to exclude competitors from the market.")

Defendants rely on *NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007) for the proposition that exclusive contracts do not result in harm to competition for antitrust purposes. (Dkt. 102, p. 19). But that case is not factually similar to the exclusive agreements entered into

31

here. In *NicSand*, it was the downstream retailers, not the upstream suppliers/competitors in the relevant market, who mandated the exclusivity agreements. *Id.* at 454 ("If *retailers* have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against a *supplier* for acquiescing to that requirement."). The court in *NicSand* found that there was no properly alleged antitrust injury: competition was not diminished by 3M's actions because it was the retailers that demanded exclusive contracts, and 3M simply replaced the prior beneficiary of those exclusive contracts, NicSand. *Id.* at 454.

The present matter is distinguishable. Defendants are a supplier and the competitor in the relevant market, not a mere retailer. Defendants' exclusionary contracts with downstream retailers have reduced competition and/or the potential for competition. The retailers in the present case did not seek out exclusionary contracts; instead, as plead by TSI, Defendants affirmatively offered cash or other consideration to retailers in exchange for a deal to keep TSI's products out of major retailers like Advance Auto and Pep Boys. (Dkt. 96, ¶¶ 223-233).

TSI has pled that Defendants have targeted its only significant competitor with an anticompetitive campaign to deny the competitor substantial access to the market, with the effect being that Defendants have been able to raise its prices to levels approaching what it charged before the entry of significant competition and reduce consumer choice. As such, TSI has clearly sufficiently pled an injury to competition to support its antitrust claims. *See Fido's Fences*, 999 F. Supp. 2d at 452.

**3.    TSI Sufficiently Pled Unlawful, Anticompetitive Conduct**

**a.    TSI'S Section 1 Claim Sufficiently Pleads an Anticompetitive Vertical Restraint on Trade**

"Section 1 of the Sherman Act prohibits, in broad terms, contracts or agreements that unreasonably restrain trade or commerce." *Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-

4429 EMC, 2011 U.S. Dist. LEXIS 35969, at *14 (N.D. Cal. Apr. 1, 2011). Defendants argue that TSI has failed to sufficiently plead a conspiracy, but a conspiracy is not necessary to establish a claim under § 1. *Eskofot A/S v. E.I. Du Pont De Nemours & Co.*, 872 F. Supp. 81, 92 (S.D.N.Y. 1995). Instead, to properly plead a § 1 claim a party must allege "(1) concerted action, (2) by two or more persons, … [which] (3) … unreasonably restrain[s] interstate or foreign trade or commerce." *Id.* at 91; *Elecs. Communs. Corp. v. Toshiba Am. Consumer Prods.*, 96 Civ. 1565 (RPP), 1996 U.S. Dist. LEXIS 11527 (S.D.N.Y. Aug. 12, 1996). When the concerted action is an agreement or contract, it is not necessary to plead that parties to the agreement had a common purpose, because the existence of the agreement "amply demonstrates that there was no independence of action." *Id.* at 91. TSI has sufficiently pled each of these factors in its Second AC, including the existence of at least one relevant agreement, and for at least this reason Defendants' motion must fail.

In this case, TSI has alleged that Defendants have entered into agreements with three of the six largest retailers in the relevant product market to prevent those retailers from distributing product from TSI, Defendants' largest competitor in this product market. (Dkt. 96, ¶ 276). These agreements constitute concerted action by two or more persons and satisfy the first two required elements.

With respect to the third element, TSI sufficiently pleads that the exclusionary agreements in question "unreasonably restrain" trade, because the agreements in question work to foreclose a substantial portion of the market to competition. *See Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group LP*, 592 F.3d 991 (9th Cir. 2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to foreclose competition in a substantial share of the line of commerce affected."). Specifically, TSI identifies six retailers that

constitute 80% of the relevant product market, and alleges that at least half of these retailers have entered into the exclusionary contracts at issue. (Dkt. 96, ¶ 200, 234). These facts state a plausible case of substantial foreclosure of the relevant market, which typically requires a foreclosure of 40%-50% of the market in a Sherman Act § 1 claim. *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) ("roughly 40% or 50% share usually required in order to establish a § 1 violation"); *see also Subsolutions, Inc. v. Doctor's Associates, Inc.*, 62 F. Supp. 2d 616, 627 (D. Conn. 1999)(finding that allegation that antitrust defendant's anticompetitive conduct foreclosed competition in the relevant market, without more, "satisfied the liberal pleading requirements of the Federal Rules of Civil Procedure.").

Defendants argue that the exclusionary contracts at issue cannot serve as the basis for a Sherman Act claim because their prices are not "predatory." (Dkt. 102, pp. 21-22). However, predatory pricing is not required to establish that an agreement constitutes an unreasonable restraint of trade, as courts instead analyze exclusionary agreements to determine if they foreclose a substantial portion of the relevant market. *Church & Dwight Co.*, 2011 U.S. Dist. LEXIS 35969, at *37 (N.D. Cal. Apr. 1, 2011) ("courts that have examined Sherman Act claims challenging attempts to monopolize retail display space through vertical agreements have not analyzed them under a predatory pricing framework and have not scrutinized whether prices were set below cost. *Rather, the focus has been on whether competition was substantially foreclosed*.") (emphasis added).[16] Whether Defendants' pricing—as reflected by the discounts or payments made as part

---

[16] *See also El Aguila Food Prods. Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 628-632 (S.D. Tex. 2003) *aff'd* 131 F. App'x 450 (5th Cir. 2005); *R.J. Reynolds Tobacco Co. v. Phillip Morris USA*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002) *aff'd* 67 F. App'x 810, 811-812 (4th Cir. 2003); *Bayou Bottling Inc. v. Dr Pepper Co.*, 725 F.2d 300, 304 (5th Cir. 1984); *Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro. Bottling Co.*, 94 F. Supp. 2d 804 (E.D. Ky. 1999); *Frito-Lay, Inc. v. Bachman Co.*, 659 F. Supp. 1129, 1134 (S.D.N.Y. 1986).

of the exclusive agreements—is predatory is not relevant to TSI's claim.[17] Instead, the relevant inquiry is whether Defendants' agreements substantially foreclosed competition in the relevant product market. TSI has plausibly pled that they have.

### b. TSI's Section 2 Monopolization Claims Sufficiently Identify Anticompetitive Behavior

TSI has alleged both monopolization and attempted monopolization under Section 2 of the Sherman Act. To state a claim for monopolization, plaintiffs must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966); *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir. 1997). To state a claim for attempted monopolization, plaintiffs must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 457 (1993). In determining whether there is a "dangerous probability" of achieving monopoly power, courts must evaluate "defendant's economic power in the relevant market." *Id.* at 100.

With respect to both claims, TSI alleged that Defendants sell products that constitute 88% of the relevant product market, and wields considerable power in that market. (Dkt. 96, at ¶¶ 193, 265). TSI has pled that in order to maintain its market share and suppress competition Defendants have entered into exclusionary dealing contracts with as many retailers as it can. (Dkt. 96, ¶¶ 195-196, 200, 276). As discussed *supra* in Sections III.D.2 and 3.1, the result of this activity has been

---

[17] TSI does not and has not waived a theory of predatory pricing and reserves its rights in this regard as discovery is conducted.

the substantial foreclosure of the relevant product market to TSI, preventing TSI from growing into new distribution channels, preventing TSI from gaining market share, and harming consumers.

In order to show that Defendants' activities in maintaining its market share are anticompetitive, the analysis of an exclusive dealing contract is similar for both Section 1 and Section 2 of the Sherman Act and largely focuses on whether there has been substantial foreclosure of competitors' access to the market. *Microsoft Corp.*, 253 F.3d at 70.[18]

Courts in the Second Circuit have refused to dismiss based on similar facts. In *Commercial Data Servers, Inc. v. IBM*, 00 Civ. 5008 (CM) (LMS), 2002 U.S. Dist. LEXIS 5600, at \*20 (S.D.N.Y. Mar. 15, 2002), the plaintiff pled that IBM threatened two "value added resellers" ("VARs") to prevent the plaintiff from distributing its competing product through those two VARs. *Id.* at \*4. Plaintiff further pled that IBM had a "market share in excess of 70% in the relevant market." *Id.* at \*23. In moving to dismiss, IBM argued that the pleading was not sufficiently detailed to plead that the alleged coercion of two VARs substantially foreclosed competition. *Id.* at \*20. The court disagreed, noting that the plaintiff described the two coerced VARs as "influential" in its opposition papers, and finding that the "two VARs may indeed be sufficient to substantially foreclose competition, depending on the particular facts relating to those VARs." *Id.* at \*21. For these reasons, the court refused to dismiss the asserted antitrust claims, including claims under § 2. *Id.* at \*21-23.

Here, TSI has pled even further details about how the exclusionary contracts were entered with retailers responsible for a large share of the market, with only six retailers accounting for over

---

[18] Indeed, because of the market power wielded by a monopolist, the amount of foreclosure necessary to considered "substantial" is lower in the context of Section 2 compared to Section 1. *See Microsoft Corp.*, 253 F.3d at 70 (explaining that use of exclusive contracts by a dominant firm "may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation").

80% of the relevant product market. (Dkt. 96, at ¶¶ 193, 265). Based on the facts as pled, TSI has more than sufficiently pled monopolization under Section 2 of the Sherman Act.[19]

Finally, Defendants do not dispute that its alleged 88% share of the market constitutes market power. Instead, Defendants argue that TSI "lumps the Defendants together" and is purportedly proceeding under a "shared monopoly" theory. (Dkt. 102, p. 23). This is not correct. To the contrary, while TSI does allege that Spectrum, which wholly owns AA/STP, directs and controls AA/STP's activities including through the actions of Defendants DeRidder and Andrysick, it is the brands sold by AA/STP that possesses 88% market share. (Dkt. 96, ¶¶ 5-15).

Regardless, it has long been the law that market power can be found in the context of a § 2 claim in the combination of a parent and its subsidiaries. *Grinnell Corp.*, 384 U.S. 563 (affirming finding of monopoly power under § 2 due to the combined market share of Grinnell and its three subsidiaries); *Omni Healthcare, Inc. v. Health First, Inc.*, No. 6:13-cv-1509-Orl-37DAB, 2015 U.S. Dist. LEXIS 7284, at *4 (M.D. Fla. Jan. 21, 2015) (complaint sufficiently alleged healthcare corporation and three wholly owned subsidiaries collectively had market power). Defendants cite three cases for the proposition that a § 2 claim may not be premised on a shared market share among individual competitors, but none of the companies in these cases were related companies, much less a parent and wholly-owned subsidiary, as is the case presented here. *See RxUSA Wholesale, Inc. v. Alton Labs., Inc*., 661 F. Supp. 2d 218, 235 (E.D.N.Y. 2009) (five separate,

---

[19] Defendants argue that TSI's claims of monopolization must fail because TSI does not plead facts establishing that Defendants gained or maintained its share via anticompetitive behavior because the only the contracts at issue were with only a "few retailers in one year." (Dkt. 102 at 22). However, TSI does not plead any duration for the agreements, other than that it is apparent that the AutoZone agreement started in 2017 and has continued without interruption to this day. (Dkt. 96, ¶ 228-229). Whether the agreements are limited to one year in duration or stretch across multiple years is not known to TSI, and will not be known until those agreements have been produced in discovery. While the duration of an exclusionary agreement can be relevant to whether there has been a substantial foreclosure of a relevant market, it is not dispositive on that issue and TSI's claim should not be dismissed at this stage without further discovery. *See Am. Express Travel Related Servs. Co. v. Visa U.S.A*., 2005 U.S. Dist. LEXIS 42852, at *21 (S.D.N.Y. June 23, 2005) ("An agreement's duration, however, is not dispositive of whether it violates § 1.").

competing pharmaceutical wholesalers who collectively control 95% of the market); *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (two separate and competing dental supply dealers); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019 (2d Cir. 1976) (automobile manufacturer and independent network of competing dealers).

Here, TSI has pled that "Spectrum Brands and AA/STP" (a parent and wholly owned subsidiary) "dominate the market for value-added auto AC recharge kits in the United States, with an estimated market share of 88% in 2017." (Dkt. 96, ¶ 193). This is sufficient for pleading purposes.

For at least these reasons, TSI has sufficiently pled its causes of action under § 2 of the Sherman Act.

### E.      TSI'S CUTPA Claim is Sufficiently Pled

Defendants seek to dismiss TSI's claims under the Connecticut Unfair Trade Practices Act ("CUTPA"). Defendants' argument is essentially that since the CUTPA claim is premised on the same factual allegations as Counts 1-6 it should be dismissed for the same reasons as those claims. Defendants do not put forward any other argument, so they have conceded that the converse is true: if the court finds that any of Counts 1-6 were sufficiently pled and should not be dismissed, Defendants' argument regarding TSI's CUTPA claims are moot.

However, even if this court were to find that Counts 1-6 to be deficient (which, respectfully, it should not), the CUTPA claim still should not be dismissed. As Defendants note, Connecticut applies the "cigarette rule" to determine whether conduct is unfair under CUTPA. The cigarette rule requires the court to consider three criteria in determining the potential unfairness of a challenged practice:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some

38

> common law, statutory, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons.

*See Indiaweekly.com, LLC*, 596 F. Supp. 2d at 506 (quoting *Zulick v. Patrons Mutual Ins. Co.*, 287 Conn. 367, 378 n.11, 949 A.2d 1084 (Conn. 2008)). Not all three criteria need to be satisfied to support unfairness. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* (quoting *Ramirez v. Health Net of the Northeast, Inc.*, 285 Conn. 1, 19, 938 A.2d 576 (Conn. 2008)).

In applying this test, Connecticut courts have found that even actions that do not "violate the literal language of the statute…may fall within the 'penumbra of [the] . . . statutory . . . concept of unfairness' that offends public policy and that therefore can constitute a basis for a CUTPA violation." *Martinez v. Yale-New Haven Hosp., Inc.*, No. (X02)CV0404001227S, 2005 Conn. Super. LEXIS 2354, at *11 (Super. Ct. Sep. 1, 2005) (quoting *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212, 227 (1995)). Indeed, even conduct such as false advertising that does not arise to the level of a Lanham Act violation can support a CUTPA claim based on the same facts. *See Indiaweekly.com*, 596 F.Supp.2d at 506 ("Although a Lanham Act violation is a per se violation of CUTPA, a party need not successfully assert a statutory claim to maintain a CUTPA claim."); *Murphy v. Provident Mutual Life Insurance Co.*, 923 F.2d 923, 929 (2d Cir. 1991) (considering CUTPA claim after dismissing trademark claim based on the same conduct).

Defendants cite *L.A. Limousine, Inc. v. Liberty Mut. Ins. Co.*, 509 F.Supp.2d 176, 183 (D. Conn. 2007) for the proposition that a court must always dismiss a CUTPA claim if the claims asserting a statutory violation based on the same facts are dismissed. (Dkt. 102 at p. 25). However, the statutory scheme that formed the basis of the CUTPA claim in that case was the Connecticut Unfair Insurance Practices Act ("CUIPA"), and as the Connecticut Supreme Court has noted,

CUIPA has long been regarded as the "exclusive and comprehensive source of public policy" in the area of unfair insurance practices. *Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602, 624, 119 A.3d 1139, 1151 (2015) (quoting *State v. Acordia, Inc.*, 310 Conn. 1, 35, 73 A.3d 711, 731 (2013)). Because CUIPA is the exclusive source of public policy for unfair insurance practices, a CUTPA claim may not survive the dismissal of a CUIPA claim.

The same is not the case for Lanham Act claims, which are not the "exclusive and comprehensive source of public policy" with regards to trademark infringement, unfair competition, or false advertising. *See Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 379 (2d Cir. 1997) (Lanham Act not preempted by other Federal unfair competition statutes, instead "section 43(a) complements the federal policy favoring competition"). For this reason, claims for false advertising and for other unfair competition under the Lanham Act can survive the dismissal of the underlying Lanham Act claims, under the theory that the conduct is unfair at least under "the penumbra of some common law, statutory, or other established concept of fairness" or otherwise offends public policy. *See Indiaweekly.com*, 596 F.Supp.2d at 506. For at least the reasons set forth in Sections III.A-C *supra*, TSI has sufficiently pled that the trademark infringement and false advertising conduct is unfair under CUTPA.

## IV.    <u>CONCLUSION</u>

For at the least the foregoing reasons, TSI respectfully submits that Defendants' Motion to Dismiss should be denied.

Dated: February 7, 2019

Respectfully submitted,

By: /s/ Steven M. Coyle
Steven M. Coyle, Esq. (ct21039)
scoyle@cantorcolburn.com
Nicholas A. Geiger, Esq. (ct28060)
ngeiger@cantorcolburn.com
Tasia E. Perkins, Esq. (ct29498)
tperkins@cantorcolburn.com
**CANTOR COLBURN LLP**
20 Church Street, 22nd Floor
Hartford, CT 06103
Tel. (860) 286-2929
Fax. (860) 286-0115

Of Counsel:

David E. Dunham, Esq.
(*pro hac vice*)
ddunham@taylordunham.com
Isabelle M. Antongiorgi, Esq.
(*pro hac vice*)
ima@taylordunham.com
Emily Young, Esq.
(*pro hac vice*)
eyoung@taylordunham.com
**TAYLOR DUNHAM AND RODRIGUEZ LLP**
301 Congress Avenue, Suite 1050
Austin, Texas 78701
Tel. (512) 473-2257
Fax. (512) 478-4409

*Attorneys for Defendants and*
*Consolidated Plaintiff*

**<ins>CERTIFICATE OF SERVICE</ins>**

I hereby certify that on February 7, 2019, a copy of the foregoing document was filed electronically and served by mail on any party unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

By: <ins>/s/ Steven M. Coyle</ins>

42